Zachary S. Bower, Esq. (SBN 17506)
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
2222 Ponce de Leon Blvd.
Miami, Florida 33134
Telephone: (973) 994-1700

*Attorney for Plaintiff and the putative Class*

[Additional Attorneys on Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ANTHONY MIRTI, Individually and On Behalf Of All Others Similarly Situated, | Civil Action No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| FERRARI NORTH AMERICA, INC., FERRARI S.P.A., ROBERT BOSCH, LLC, and ROBERT BOSCH GMBH, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## TABLE OF CONTENTS

**Section**                                                                          **Page**

I.      INTRODUCTION ................................................................................... 1

II.     PARTIES ................................................................................................ 7

        Plaintiff ............................................................................................... 7

        Defendants ........................................................................................ 14

III.    JURISDICTION AND VENUE ........................................................... 17

IV.     FACTUAL BACKGROUND ............................................................... 28

        A.    FERRARI AND BOSCH TOGETHER DESIGN AND MANUFACTURE THE
              BRAKING SYSTEMS IN THE CLASS VEHICLES AND THE DEFECTIVE
              MASTER CYLINDER / BRAKE BOOSTER ASSEMBLY ................................. 28

        B.    THE CLASS VEHICLES ARE DEFECTIVE AND CONTINUE TO POSE A
              DANGEROUS SAFETY RISK TO PLAINTIFF AND MEMBERS OF THE
              CLASS ................................................................................................... 29

              1.    A Simplified Explanation On The General Principles Of The
                    Operation Of The Braking System. ............................................. 29

              2.    The Definition of the Brake Defect, Cap and Warning Repair, and
                    the Defective Master Cylinder/Brake Booster Assembly. ........... 31

              3.    Defendants Have Not Remedied The Brake Defect In The Class
                    Vehicles And It Continues To Pose A Dangerous Safety Risk To
                    Plaintiff And Members Of The Class. .......................................... 32

              4.    The Cap and Warning Repair Is Ineffective, Incomplete, Subject
                    To Delays, And May Make The Class Vehicles More Dangerous.
                    ................................................................................................... 34

        C.    FERRARI AND BOSCH KNEW OF THE BRAKE DEFECT BUT
              MISREPRESENTED AND/OR CONCEALED ITS EXISTENCE ....................... 37

              1.    Each Class Is Certified To Be In Compliance With All Federal
                    Motor Vehicle Safety Standards, Undergoes An Extensive Design
                    And Manufacturing Process, And Is Subject to Rigorous Pre-
                    Production Testing. ..................................................................... 38

              2.    Ferrari Spa Sent A Technical Engineer To Examine A Failed
                    Vehicle In 2016 Who Testified The Braking System In The Class

Vehicles Is Operative Even In Case Of Failure Of The Brake Booster  Vacuum, Ferrari NA Has Also Been Involved In Domestic Litigation. ................................................................. 43

3.    Consumer Complaints To NHTSA. ............................................... 48

4.    Ferrari Monitors and Reviews Consumer Feedback and Customer Complaints, An Essential Practice In Maintaining A Luxury Brand. ............................................................................................... 51

5.    Highly Publicized Manifestations Of The Defect In The Media. . 52

6.    Post-Failure Mode Analysis, Warranty Claims, And Reports From Authorized Dealerships. ............................................................... 56

7.    Ferrari And Bosch Monitored The Above Information And Knew Of  The Existence Of The Brake Defect. ....................................... 58

D.    FERRARI WAS LEGALLY REQUIRED TO DISCLOSE THE BRAKE DEFECT AS A KNOWN SAFETY DEFECT AND FAILED TO DO SO ............................. 61

E.    PLAINTIFF AND CLASS MEMBERS WOULD NOT HAVE PURCHASED, THE CLASS VEHICLES HAD THEY KNOWN OF THE BRAKE DEFECT ............. 62

F.    FERRARI HAS MANIPULATED ITS WARRANTY TO MINIMIZE ITS OBLIGATION TO FIX THE BRAKE DEFECT IN THE CLASS VEHICLES .... 63

G.    ALLEGATIONS ESTABLISHING AGENCY RELATIONSHIP BETWEEN FERRARI NA AND FERRARI DEALERSHIPS IN THE UNITED STATES...... 64

V.    DEFENDANTS SCHEMED TO DEFRAUD PLAINTIFF AND CLASS MEMBERS BY MAKING MISLEADING STATEMENTS ABOUT CLASS VEHICLE SAFETY AND BRAKING CAPABILITY. .................................................. 68

A.    EACH CLASS VEHICLE HAS SEVERAL "IN-VEHICLE" SAFETY LABELS THAT MISLEADINGLY ASSURED CONSUMERS THAT THE CLASS VEHICLES CONTAINED A BRAKING SYSTEM THAT FUNCTIONED PROPERLY ................................................................................ 68

1.    Ferrari NA distributed  Class  Vehicles with Monroney labels that had misleading assurances  regarding safety. ............................... 69

2.    Ferrari SpA affixed  misleading safety certification labels to the Class Vehicles. ............................................................................ 73

3.    Ferrari NA provided  misleading in-vehicle safety information, such as in the Warranty Card  and Owner's Service Book, about brakes and required maintenance of  the braking system. ............ 75

B.  FERRARI NA IMPORTED VEHICLES INTO THE UNITED STATES AND WARRANTED THE VEHICLES COMPLIED WITH FEDERAL MOTOR VEHICLE SAFETY STANDARDS. ........................................................ 76

C.  FERRARI SPA AND FERRARI NA ALSO MADE FALSE AND MISLEADING STATEMENTS ABOUT THE CLASS VEHICLES' SAFETY IN THEIR CONSUMER-FACING MARKETING. ................................................ 78

VI.     FRAUDULENT OMISSION ALLEGATIONS ........................................... 81

VII.    TOLLING OF STATUTES OF LIMITATIONS ......................................... 84

A.  DISCOVERY RULE TOLLING ................................................... 84

B.  FRAUDULENT CONCEALMENT TOLLING .......................... 85

C.  ESTOPPEL ...................................................................................... 85

VIII.   CLASS ACTION ALLEGATIONS ............................................................ 86

IX.     COUNTS BASED ON FLORIDA COMMON LAW .................................... 89

COUNT 1: FRAUD BY CONCEALMENT OR OMISSION ................ 89

COUNT 2: NEGLIGENT MISREPRESENTATION ............................. 91

COUNT 3: UNJUST ENRICHMENT ....................................................... 92

X.      COUNTS BASED ON FLORIDA STATUTORY LAW ............................. 94

COUNT 4: BREACH OF EXPRESS WARRANTY ............................... 94

COUNT 5: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ................................................................. 95

COUNT 6: VIOLATIONS OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT ........................................................ 98

XI.     PRAYER FOR RELIEF ............................................................................... 100

XII.    DEMAND FOR JURY TRIAL .................................................................... 101

## CLASS ACTION COMPLAINT

Plaintiff Anthony Mirti ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendants Ferrari North America, Inc. ("Ferrari NA") and Ferrari S.p.A. ("Ferrari SpA" and Ferrari NA, collectively referred to as "Ferrari"), Robert Bosch GmbH ("Bosch GmbH"), and its agent/alter ego Robert Bosch, LLC ("Bosch LLC", collectively referred to as "Bosch" or "Bosch GmbH", and with Ferrari as "Defendants") to obtain damages, restitution, and/or injunctive relief for himself and on behalf of the proposed Class as defined herein. Plaintiff makes the following allegations upon information and belief, the investigation of his counsel, and facts that are of public record, except as to his allegations, which are made with personal knowledge.

## I.   INTRODUCTION

1.     Ferrari is the world's preeminent luxury sports car brand. The company has developed a passionate following of automotive enthusiasts, investors, and collectors of classic and exclusive models.[1]

2.     A Ferrari is also a commodity, limited in production and limited in terms of access—with the most exclusive vehicles restricted to preferred customers.[2] This strategy of exclusivity and aggressive brand protection is a bulwark to ensure a Ferrari is worth more than the

---

[1] Press Releases, *Brand Finance Global 500 Names Ferrari As The World's Strongest Brand For Second Consecutive Year*, Ferrari (Jan. 22, 2020), https://www.ferrari.com/en-EN/corporate/articles/brand-finance-global-500-names-ferrari-as-the-worlds-strongest-brand-for-second-consecutive-year-corp

[2] In a statement concerning Ferrari's decision to "blacklist" certain celebrities, Ferrari stated it "reserves the right to decide on special editions." *See Ferrari responds if it banned Justin Bieber and the Kardashians from buying its cars*, MARCA (May 2022) https://www.marca.com/en/lifestyle/celebrities/2022/05/17/6283c08ce2704e70438b457e.html.

sum of its parts.[3] Consumers who purchase a Ferrari are paying a premium and are buying into Ferrari culture—with loyal consumers rewarded with more exclusive models that may appreciate in value.[4] Ferrari goes to great lengths to protect its brand, which played a significant role in Plaintiff's and the Class Members' decision to purchase or lease a Ferrari.

3.      Ferrari's standing in the automotive world makes the facts of this case particularly jarring and consequential. Ferrari has long known about a critical safety defect in its vehicles. Although it may not always be detected due to the limited recreational use of these vehicles, this does not diminish the severe, potentially fatal risks it poses to the Plaintiff and Class Members. It appears that Ferrari has prioritized profits and reputation over consumer safety, neglecting a defect in one of the most crucial components of any high-performance sports car: the braking system.

4.      After multiple reported brake failures attributed to a component manufactured by Bosch GmbH, on October 28, 2021, Ferrari SpA directed Ferrari NA to conduct a voluntary recall in the United States.[5] In the initial recall, Ferrari NA described the defect as follows: the "vehicles are equipped with a braking system that could potentially leak brake fluid, which may lead to partial or total loss of braking capability."[6] Ferrari NA identified the brake components as manufactured by Bosch and installed in Class Vehicles (defined below) that Ferrari SpA

---

[3] *The 15 Most Expensive Ferraris Ever Built*, Elite Traveler (Jan. 5, 2018), https://elitetraveler.com/luxury-transport/automotive/the-15-most-expensive-ferraris-ever-built.

[4] When it comes to owning a special Ferrari, the saying goes, "You don't choose Ferrari. Ferrari chooses you." *See* Nadeem Sarwar, *The Reason Why Jay Leno Will Never Own A Ferrari*, SlashGear (June 2022), https://www.slashgear.com/898761/the-reason-why-jay-leno-will-never-own-a-ferrari/.

[5] As the recall was voluntary, the recall was made prior to any involvement by NHTSA nor has NHTSA initiated an investigation or made any determination into the adequacy of the recall.

[6] *Part 573 Safety Recall Report 21V-833*, NHTSA (2021), available at: https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V833-4048.PDF

manufactures.[7] Ferrari NA identified the defective component as the master cylinder/brake booster assembly—even identifying the very same part number as defective that Plaintiff replaced when his brakes failed.[8]

     5.    Defendants' knowledge of the Brake Defect (defined below) likely originated during extensive pre-production design and testing.[9] At a minimum, Defendants' knowledge can also be traced to a fatal accident on June 9, 2015, where, despite the driver's insistence on complete brake failure at his subsequent criminal trial, a Ferrari SpA technician testified the braking systems at issue are "operative even in case of failure of the brake booster vacuum"—testimony now contradicted by Ferrari's disclosures to the NHTSA.[10] Ferrari NA was also involved in litigation in Wisconsin following a crash on July 7, 2017—a crash consistent with the failure mode described in the recalls—even answering the litigation nearly a year prior to Plaintiff's dangerous incident.[11] Likewise, Defendants were involved in an action in the District of New Jersey on December 30, 2021, precipitating Defendants' second, broader recall, where plaintiffs allege their Ferrari

---

[7] Bosch GmbH and Ferrari SpA worked together to design, test, and approve the braking systems present in the Class Vehicles.

[8] Other owners have come forward online, claiming that Ferrari has long known that Component Part Number 000244010 is defective, with one owner posting a maintenance record online from Ferrari dated November 18, 2017 identifying this very same part number. *See* Exhibit A (reviewing consumer complaints on FerrariChat, an online community sponsored by, among other authorized Ferrari dealerships, Ferrari of Fort Lauderdale in Florida).

[9] Each Ferrari takes nearly three months to complete and is designed to withstand strenuous racing conditions—Ferrari even maintains a private racetrack for this very reason. *See* Eleanor Peake, *Inside the top secret factory where new Ferraris are born* (WIRED 2018) https://www.wired.co.uk/article/ferrari-car-factory-manufactured-italy-enzo-build-create.

[10] *RC 80 Chronology*, NHTSA (2023), available at: https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V536-2774.pdf.

[11] *See Joel Saban, et al. vs. Ferrari North America, et al.*, Docket No. 2021CV000087 (Wis. Cir. Ct. Mar. 10, 2021) (the "*Saban* Action").

vehicles suffered from a dangerous safety defect involving the brake system in the Class Vehicles.[12]

6.     In the nine years since the 2015 incident, Defendants received substantial evidence that there exists a severe issue in the braking system of the Class Vehicles, including but not limited to: (1) testing conducted to remain in compliance with Federal Motor Vehicle Safety Standard ("FMVSS") regulations, as well as certifications made to the National Highway Traffic Safety Association ("NHTSA") and U.S. Customs and Border Protection ("Customs"); (2) international and domestic litigation alleging defective brake boosters in the Class Vehicles; (3) complaints filed directly to NHTSA which Ferrari NA is legally obligated to monitor; (4) an outpouring of discussion on Ferrari owner forums, such as FerrariChat, which is sponsored by several authorized Ferrari dealerships; (5) highly publicized manifestations of brake failure in the Class Vehicles reported on by automotive news outlets; (6) warranty claims submitted to Ferrari's network of dealerships—potentially the primary source of Ferrari's knowledge and in its exclusive possession; (7) discussions between customers and Ferrari customer relations executives; and (8) post-failure communications between Bosch GmbH and Ferrari SpA concerning the root cause of any braking issues in the Class Vehicles, including post-recall.[13]

7.     On July 26, 2022, Ferrari NA greatly expanded its initial recall and began offering a purported "remedy" involving replacing the brake fluid cap at the entry point to the brake fluid

---

[12] *See Rose vs. Ferrari North America, et al.*, No. 2:21-cv-20772 (JKS) (CLW) (D.N.J.) (class action bringing claims under the laws of Georgia, New Jersey, and Texas).

[13] Ferrari admitted knowledge to at least twelve other incidents involving the loss of brake fluid that may have resulted in the partial or total loss of braking capability. *See Infra* § IV.C; Exhibit A; RC 80 Chronology, *supra*, note 10.

reservoir component of the braking system.[14] Yet in a later-filed document, Ferrari identified two failure modes that can cause complete brake failure—with only one failure mode affecting Part Number 000244010, which Ferrari previously identified as the defective component.[15] The first failure mode involves the rearmost seal (or the isolation seal) twisting out of place, which causes the brake fluid to leak from the master cylinder into the brake booster.[16] The brake fluid leak depletes the fluid levels in the primary brake circuit (front brakes), causing the primary circuit to lose braking capabilities.[17] According to Ferrari, "[w]hen this happens, the brake capability is limited to the secondary circuit" ("Failure Mode One").[18] However, the Brake Defect may also cause failure of the secondary circuit (rear brakes), making braking capabilities "almost totally compromised." Specifically, when the rearmost seal twists, ventilation is affected, creating a vacuum inside the brake fluid reservoir that causes "the secondary circuit [to] fail" ("Failure Mode Two").[19]

8.      As confirmed in Ferrari NA's public filings, the recall remedy of replacing the brake fluid cap only acts as an interim corrective measure for Failure Mode Two. It also provides a warning system for Failure Mode One via a software update should the rearmost seal twist and brake fluid leak.[20] Despite Ferrari's knowledge of Failure Mode One, it has not released any

---

[14] Part 573 Safety Recall Report 21V-833, *supra* note 6.

[15] RC 80 Chronology, *supra*, note 10.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Part 573 Safety Recall Report 22V-536*, NHTSA (2022), available at: https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V536-4846.PDF.

countermeasure to remedy the failure mode or to prevent the twisting of the rearmost seal otherwise.  Indeed, Ferrari NA admitted that "[d]espite numerous tests conducted, Ferrari has not yet been able to reproduce the twisting of the isolation lip seal and the movement out of its groove."[21]  Together, the failure modes are in direct violation of FMVSS 105 and 135, which provide, among other things, that a loss of fluid from one compartment shall not result in a complete loss of brake fluid from another compartment.[22]

9.      Despite this knowledge and in breach of their obligations to Plaintiff and the Class, Ferrari and Bosch have failed to act. Defendants have not informed owners of the full extent of the Brake Defect, only remedied one failure mode, and continue to sell (or benefit from the sale) of thousands of cars containing this life-threatening defect.[23] Ferrari's recalls do not call for what is needed – *i.e.*, a replacement of the defective master cylinders if brake fluid leaks are found (and, therefore, the rearmost seal has twisted and is damaged).

10.      Defendants omitted information concerning the Brake Defect from all advertising, promotion, or other contacts with Plaintiff and Class members prior to their purchase or lease of the Class Vehicles. Defendants also schemed to defraud Plaintiff and Class Members by aiding, abetting, and/or making misleading statements about class vehicle safety and braking capability,

---

[21] RC 80 Chronology, *supra* note 10.

[22] Even more concerning, Plaintiff has reason to believe that the cap replacement may have the effect of making the vehicles more dangerous and more prone to brake failure. By way of example, at least one complainant to NHTSA experienced a complete loss of braking capability and slammed into a wall while driving, despite *having previously had the recall repair performed*. *Infra* § IV.C.3.

[23] 'Thousands of vehicles' is the key metric here—this is not an action where millions of trucks or cars were sold to and driven every day by the general public—most Ferraris are only driven a few thousand miles per year, if at all. The fact that a statistically significant percentage of owners have reported problems in such a small population size is staggering and highly indicative of the gravity of this issue.

including when affixing or providing to each owner or lessee: (i) certification labels that uniformly communicate compliance with motor vehicle safety standards in every Class Vehicle; (ii) in-vehicle safety information, such as in the Warranty Card and Owner's Service Book, about brakes and required maintenance of the braking system; and (iii) other consumer-facing marketing up to and at the point of sale including the Monroney label. In short, Defendants had a duty to disclose the Brake Defect because they made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations.

11.     Plaintiff brings this action on behalf of himself and all those similarly situated for Defendants' unlawful conduct under the laws of the State of Florida. Plaintiff seeks damages for overpayment at the point of sale, diminution of value, the cost of repair of the Class Vehicles, attorneys' fees and costs, punitive damages, and any other legal relief available for his claims. Had Defendants disclosed the Brake Defect at the point of sale or lease, Plaintiff and Class Members would have seen such disclosures and would not have bought or leased the Class Vehicles. Plaintiff and the Class have thus been harmed and seek all available relief.

## II.     **PARTIES**

### **Plaintiff**

12.     Plaintiff Anthony Mirti ("Plaintiff") is a citizen of the state of Florida, residing in Vero Beach, Florida. Plaintiff Mirti purchased a certified pre-owned 2018 Ferrari 488 Spider, VIN ZFF80AMA0J0234234 (Plaintiff's "Class Vehicle"), in July 2019 from an authorized Ferrari dealership, S & W Sports Cars, Inc. d/b/a Ferrari Maserati of Atlanta ("Ferrari Dealership"), from his home in Florida.

13.     Plaintiff Mirti found a listing for the Class Vehicle through research online and through Ferrari's website. On June 17, 2019, Plaintiff contacted the Ferrari Dealership and requested information regarding the Class Vehicle. Plaintiff informed Ferrari that he was a resident of Florida and provided the Ferrari Dealership with his contact information and address.

14.     Also, on June 17, 2019, the Ferrari Dealership sent Plaintiff an information packet via iPacket, which Ferrari described as a "customized vehicle information packet we built for you."

15.     Inside the information packet, Plaintiff viewed and inspected a Monroney label, which provided detailed specifications concerning the braking system. The Monroney label also informed Plaintiff that the vehicle was assembled in Maranello, Modena, Italy. The Monroney label also stated that it had been affixed by Ferrari NA pursuant to the requirements of U.S.C. 15§ 1231, *et seq.*, which prohibited its "removal or alternation prior to delivery to the ultimate purchaser." A copy of the Monroney label provided by the Ferrari Dealership is below:



16.     On June 18, 2019, the Ferrari Dealership utilized Ferrari SpA's dealership database in Italy to access Ferrari.IT, to send options to Plaintiff Mirti in Florida on selections for his vehicle, as shown below:





17.     In addition, over the next several days, an Associate of the Ferrari Dealership communicated with Plaintiff and sent him information including photos, comments, the CarFax, Vehicle Report, Warranty Information, AutoCheck, CPO Warranty, Mechanical Check, and the About Us of the Ferrari Dealership.

18.     Plaintiff and Ferrari then discussed pricing on the Class Vehicle and reached an agreement in principle on the price in Florida.

19.     On June 19, 2019, the Ferrari Dealership performed a Ferrari 101 Point Check List under Ferrari SpA's Ferrari Approved Certified Pre-Owned Program whereby the Class Vehicle was certified that its "Brake Operation" and "Vehicle Performance" were satisfactory.

20.     Also on June 19, 2019, as Associate of Ferrari stated to Plaintiff: "If you want to send me a copy of your driver's license and what county you are in I can contact the State of Florida and verify your tax tag and title fees" – as well as sent additional photos to Plaintiff.

21.     On or around June 20, 2019, Plaintiff Mirti visited his bank in Florida and obtained a Cashier's Check for $10,000.00 to be used for the deposit on the Class Vehicle.

22.     On June 20, 2019, Plaintiff Mirti flew to the Ferrari Dealership to test drive the Class Vehicle. After the test drive, Plaintiff Mirti provided the Ferrari Dealership with the Cashier's Check and signed the required documents.

23.     Prior to the purchase of his Class Vehicle, Plaintiff Mirti viewed and inspected the permanent certification label affixed by Ferrari SpA dated February 2018, that stated: "[t]his vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." A copy of that certification label is provided below:



24.     The Ferrari Dealership agreed to ship the Class Vehicle to Plaintiff Mirti's residence in Vero Beach, Florida. The Ferrari Dealership also agreed to handle tax tags and license fees with the State of Florida.

25.     The Ferrari Dealership sent instructions for Plaintiff to wire the total payment to their bank in Jackson, Mississippi. Over the next several days, a wire transfer was completed from Plaintiff's financial accounts in Florida to the Ferrari Dealership's accounts in Mississippi.

26.     On July 3, 2019, the Ferrari Dealership sent Plaintiff an invoice for the amount left outstanding on the Class Vehicle for licensing to the State of Florida.

27.     On July 8, 2019, the outstanding balance on the Class Vehicle was paid, and the transaction for the purchase of the Class Vehicle was completed.

28.     Plaintiff paid sales tax to the State of Florida on his Class Vehicle.

29.     Plaintiff, after that, conducted routine maintenance and inspections at his local authorized Ferrari dealer, Ferrari Maserati of Central Florida, Inc. (4891 Vineland Road, Orlando, FL 32811) ("Ferrari of Orlando").

30.     Ferrari of Orlando failed to inform Plaintiff of the dangerous safety defect in his Class Vehicle during each inspection and prior to experiencing the Brake Defect.

31.     On September 7, 2021, Plaintiff Mirti was driving his Class Vehicle and had traveled approximately 8 to 10 miles when the car suddenly displayed the message: "Brake Fluid Level Low, Go To Dealer Slowly" As Plaintiff Mirti slowed the car from approximately 45 MPH, the brakes did not provide sufficient stopping power, but with down-shifting and dangerously low braking force he was able to regain minimal control of the car. He attempted to limp home at 5 to 10 MPH; however, within 3 miles or so, the brakes failed. The mileage on the vehicle at the time of failure was approximately 6,787.

32.     Once the brakes failed, Plaintiff Mirti's vehicle ran a stop sign before Plaintiff Mirti was able to maneuver his vehicle off the road into a parking lot. Plaintiff Mirti was able to stop the Class Vehicle by rolling into an uphill parking spot and hitting the concrete parking barrier. Plaintiff Mirti turned the engine off in order to keep the car from rolling backward.

33.     When trying to activate the electronic hold function to keep the car from rolling backward, the car displayed the message: "Depress Brake Pedal to Activate Hold." However, when the brake pedal was fully depressed, the function would not activate even though it worked fine prior to the brake failure (and subsequent to repair). The car was towed to the dealer and repaired under warranty. The service manager reported that the Master Cylinder leaked brake fluid into the vacuum booster. Plaintiff Mirti requested that the failed parts be returned to him. However, the service manager advised that failed parts replaced under warranty are returned to Ferrari. Plaintiff

Mirti remains very concerned that the replacement Master Cylinder in his Class Vehicle is defective, as there appears to be no change in the design of the replacement part he received.

34.     Plaintiff Mirti's Service Invoice from September 8, 2021, prepared by a Service Manager at Ferrari of Orlando, reported that the Master Cylinder leaked brake fluid into the vacuum booster. Stating in part as follows:

> Checked for leaks, no external leaks found, removed luggage compartment and checked booster, found fluid in booster. Removed and replaced booster/master servo assembly. Checked labor tree on labor op for booster and found bleeding not included. Performed brake bleed multiple times using DEIS to get all air out of system. Checked operation of brakes, noted that brake light was illuminated all the time. Removed brake switch and pulled plunger to perform length calibration due to booster replacement. Brake lights operated normally.

35.     The replacement part identified by Ferrari of Orlando was Part Number 244010 2EA Brake Servo Compl. with Pump, a part manufactured and sold by Bosch GmbH.

36.     Through its dealer agreements and other methods, Ferrari NA has control over the consumer-facing information and disclosures provided to consumers, such as window stickers and other legally required notices. As a certified Ferrari dealer, the dealership from which Plaintiff purchased his vehicle, past and present, acted as Defendants' agent regarding the disclosures and other representations made to consumers about the characteristics of its Class Vehicles, including to Plaintiff.

37.     Bosch GmbH, through its agent/alter ego Bosch LLC, also omitted the Brake Defect from technicians responsible for repairing or replacing defective components in Ferrari Class Vehicles. Bosch GmbH offers specialized tools, Bosch support and training to service/repair Bosch components to exotic motor vehicle dealerships, and yet concealed any issues related to the Brake Defect. Upon learning of a systemic defect in the Class Vehicles, Bosch GmbH had a duty to disclose this known safety defect to Ferrari SpA, its technicians, or certified technicians in exotic

motor vehicle dealerships, which in turn had a duty to disclose the issue to Plaintiff and the Class.

38.     Defendants failed to disclose that the Class Vehicles suffer from the Brake Defect and omitted the existence of the Brake Defect from the materials provided to the general public and consumers of the Class Vehicles. Prior to purchase, Plaintiff reviewed all paperwork provided by Ferrari and its dealerships or provided by private sellers' documents created by Ferrari, including warranty materials, advertising, and promotional materials. Plaintiff has been an avid Ferrari owner and fan for many years, researching vehicles on Ferrari's website and on various forums that Ferrari monitors. However, despite Defendants' knowledge of the Defect, Ferrari did not disclose the Brake Defect. As a result of Defendants' omissions, at the time that Plaintiff purchased his vehicle, Plaintiff believed that his Class Vehicle was safe and reliable.

39.     Defendants acted in bad faith because Defendants knew, at the time, that they designed, tested, validated, marketed, sold, and provided written warranties for the Class Vehicles to consumers that the Class Vehicles suffer from the Brake Defect. Notwithstanding that knowledge, Defendants concealed the existence of the Brake Defect within the written warranties and elsewhere. Thus, any durational limits in its warranties are unconscionable and unenforceable.

40.     Had Plaintiff and Class Members, or any other reasonable person, known that the Class Vehicles suffered from the Brake Defect, they would not have purchased their Class Vehicles.

<u>**Defendants**</u>

41.     Defendant Ferrari S.p.A. ("<u>Ferrari SpA</u>") designs and manufactures sports cars that are synonymous with luxury, speed, and performance. Ferrari SpA is based in Maranello, Italy. Approximately 3,800 Ferraris are sold each year, with prices starting at $120,000. The Class Vehicles were designed and manufactured by Ferrari SpA.

42.     Pursuant to 49 CFR § 551.46, Ferrari SpA was required to designate an agent for service of process in the United States as a foreign manufacturer of the Class Vehicles. Ferrari NA, as Ferrari SpA's domestic subsidiary for the United States market, is the proper agent to effectuate service on Ferrari SpA.

43.     Defendant Ferrari North America, Inc. ("Ferrari NA") is an automobile distributor incorporated in Delaware with its principal place of business at 250 Sylvan Avenue, Englewood Cliffs, New Jersey. Ferrari NA is the exclusive distributor and warrantor of Ferrari automobiles, parts, and accessories manufactured by Ferrari SpA to retail dealers in the United States. Ferrari NA distributed, sold, serviced, and/or warranted thousands of Class Vehicles, directly or indirectly, to Plaintiff and Class Members with the understanding and expectation that Class Vehicles would be sold, operated, and fit for their intended purpose across the country, including in Florida.

44.     At all times relevant to this action, Ferrari NA sold and warranted the Class Vehicles throughout the United States, and specifically in Florida. Ferrari SpA and/or its agents, divisions, or subsidiaries designed and manufactured the Class Vehicles. Together with Ferrari SpA, Ferrari NA developed and disseminated the owner's manuals, supplements, warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Ferrari NA, with the consent of Ferrari SpA, provided these to its authorized dealers for the express purpose of having these dealers pass such materials to potential purchasers at the point of sale. Ferrari NA and Ferrari SpA also created, designed, and disseminated information about the quality of the Class Vehicles and their braking components to agents of various publications for the express purpose of having that information reach potential consumers.

45.     Defendant Robert Bosch GmbH ("Bosch GmbH") is a German multinational engineering and electronics company headquartered in Gerlingen, Germany. Bosch GmbH is the

parent company of Robert Bosch LLC. Bosch GmbH, at all material times, designed, manufactured, and supplied the defective brake components to Ferrari. Bosch GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over Robert Bosch LLC and over the design, development, manufacture, distribution, testing, and sale of thousands of the braking systems installed in the Class Vehicles sold or leased in the United States. Employees of Bosch GmbH have collaborated on the concealment and omission of the Brake Defect in this judicial district and have been present in this district.

46.     Pursuant to 49 CFR § 551.46, Bosch GmbH was required to designate an agent for service of process in the United States as a foreign manufacturer of vehicle equipment. Bosch LLC, as Bosch GmbH's agent/alter ego for the United States market, is the proper agent to effectuate service on Bosch GmbH.

47.     Defendant Robert Bosch LLC ("Bosch LLC") is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan. Bosch LLC is wholly owned by Robert Bosch North America Corporation, which in turn is wholly owned by Defendant Bosch GmbH. Bosch LLC is also the United States authorized agent, representative, servant, employee, and/or alter ego of Bosch GmbH and performs activities including, but not limited to, servicing warranties, replacements and repairs, dissemination of technical information, and monitoring the performance of vehicles containing parts designed, manufactured, sold, repaired, and replaced by Bosch, including substantial activities that occurred within this district. Bosch LLC is the agent/alter ego of Bosch GmbH for the following non-exhaustive reasons, along with the reasons listed in the "Jurisdiction and Venue" Section:

     (a)     Bosch owns and operates a website, available in all states, including Florida,

which highlights the collective identity of the Bosch entities stating, "We are Bosch" and "We are an international company…constantly extending our global presence", and "our distinctive corporate culture is a common bond. We live by our values and strive for continuous improvement. We are proud to work for Bosch."[24]

(b)     The president of Bosch LLC also holds a high-level management position at Bosch GmbH;

(c)     "[T]he board of management of Robert Bosch GmbH defines the strategy for the entire company and leads the company as a whole.";[25]

(d)     "The Robert Bosch GmbH supervisory board appoints, monitors, and advises the board of management." Bosch GmbH exercises "management and control over Bosch LLC.";[26] and

(e)     Bosch's sworn witness provided testimony evidencing that "Bosch GmbH has direct supervisory responsibility for the business functions of all business entities, as all entities report up the chain to Bosch GmbH, and many business functions transcend across multiple legal entities."[27]

## III.     JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), as modified by the Class Action Fairness Act of 2005 because Plaintiff and Defendants are citizens

---

[24] *We are Bosch* (2024), available at: https://wearebosch.com/index.en.html.

[25] *Bosch Annual Report 2021*, available at: https://www.bosch.com/company/annual-report/.

[26] *Id.*

[27] *J.S.T. Corp. v. Robert Bosch LLC*, No. 15-13842, 2019 WL 1857088, at *5 (E.D. Mich. Apr. 24, 2019), *report and recommendation adopted*, No. 15-13842, 2019 WL 1790255 (E.D. Mich. Apr. 24, 2019)

of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class Members reside across the United States. The citizenship of each party is described in more detail above in the "Parties" section above. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

49.     This Court has specific personal jurisdiction over Bosch GmbH and its authorized agent, representative, servant, employee, and/or alter ego Bosch LLC, by their purposeful availment and deliberate targeting of Florida consumers, including Plaintiff. Personal jurisdiction over Bosch is also appropriate because (1) Bosch offers training, support, specialized tools, and replacement parts to exotic vehicle technicians in Florida who service brake components designed and manufactured by Bosch GmbH in the Class Vehicles, and Bosch has a service solutions headquarters in Florida; (2) Plaintiff's Class Vehicle was serviced at Ferrari of Orlando, a dealership that receives specialized tools, replacements parts and support directly or indirectly from Bosch—and when the brakes in Plaintiff's Class Vehicle failed in Florida, Ferrari of Orlando replaced the Defective Master Cylinder / Brake Booster Assembly with the same defective component designed and manufactured by Bosch GmbH; and (3) subjecting Bosch GmbH and Bosch LLC to jurisdiction in Florida is reasonable and in accordance with traditional notions of fair play and substantial justice because Bosch has a significant presence in Florida including the headquarters of its fastest growing division in the United States for Bosch Global, pays Florida employment and property taxes, and reasonably could be hauled into Court in Florida as the result of an injury it caused in Florida.

50.     Moreover, Bosch LLC is the agent/alter ego of Bosch GmbH, and jurisdiction here is appropriate for the following reasons:

(a)     Bosch GmbH designed and manufactured brake components for Ferrari;

(b)     Bosch GmbH is one of the largest suppliers of auto parts in the world, including brake-related replacement parts;

(c)     Bosch GmbH distributes replacement parts, including brake parts, in the U.S., including in Florida, through both its distributor in the U.S., Bosch LLC and through the Bosch Auto Parts website;[28]

(d)     The Bosch Auto Parts website encourages users to obtain assistance from Bosch by contacting it with any questions. The website also provides a function that allows users to search for a particular auto part that fits their needs by entering their Vehicle Identification Number or the year, make, model, and engine type of their vehicle. The Bosch Auto Parts website allows consumers to search for Bosch-manufactured parts by name, model, or original equipment manufacturer number. The Bosh Auto Parts website also provides various types of products for sale, including brake-related replacement parts and brake fluid;

(e)     Bosch also operates Bosch Automotive Service Solutions, which "provides the aftermarket and workshops worldwide with a complete range of diagnostic and repair shop equipment and a wide range of spare parts for passenger cars and commercial vehicles. Its product portfolio includes products made as Bosch original equipment, as well as aftermarket products and services developed and manufactured in-house";[29]

---

[28] *Bosch Auto Parts* (2024), available at: https://www.boschautoparts.com/.

[29] *About us*, Bosch (2024), available at: https://boschautomotiveservicesolutions.com/about-us.

(f)     Bosch offers specialized tools, support, and training to service/repair Bosch components to exotic vehicle centers, including those servicing Ferrari Class Vehicles in Florida;

(g)     The defective brake components manufactured and sold by Bosch were installed in Plaintiff's Class Vehicle, subsequently sold and shipped to Plaintiff and Class Members purchasing, leasing, or residing in Florida;

(h)     The defective brake components manufactured and sold by Bosch failed and caused injuries to Plaintiff in the State of Florida;

(i)     The defective replacement brake components manufactured and sold by Bosch were shipped to Florida and installed in Plaintiff's Class Vehicle as replacement parts.

(j)     In 2015, Bosch opened the US Bosch Service Solutions site at Fort Lauderdale, and it has "undergone tremendous growth and expansion into new areas in their five years!" The Bosch website touts that "with two sites in unique places in the country, Bosch Service Solutions North America is the fastest growing division in the US for Bosch Global, and we are quickly becoming a go-to solution for our internal partners."[30]

(k)     Bosch has employees and agents in the State of Florida that are subject to Florida property taxes;

(l)     Bosch GmbH's website for its "mobility" services indicates that its purpose is to provide comprehensive "connected" services for automobiles. The

---

[30] *Our locations in USA: Burnsville and Fort Lauderdale*, BOSCH (2024), available at https://www.boschservicesolutions.com/en/career/our-locations/usa/

vehicle management platform enables cloud-based services for all vehicle segments throughout the life cycle of the vehicle. Drivers are provided with up-to-date information from the "cloud," such that the vehicle itself "becomes a central component of the Internet of things."[31]

(m)    There are at least four "Robert Bosch" entities registered with the Florida Secretary of State to operate within the state;

(n)    There are over nine authorized "Bosch" automotive service centers throughout the State of Florida;

(o)    Privacy notices and cookies on Bosch GmbH's "mobility" website indicate that Bosch GmbH collects and processes personal data from online consumer visits to its website;

(p)    Bosch GmbH's privacy notices on its websites further indicate that it uses the data for "[a]n overriding legitimate interest on our part in direct marketing," "advertising," "improvement of our products and services," "[r]esponding to user inquiries within the scope of the [online] contact form," and "self-promotion and promotion by others as well as market research and reach analysis"[32];

(q)    The privacy notices further state that, with respect to "[t]ransmission of data to service providers," "[w]e use external service providers for tasks such as

---

[31] *Connected Service for Automobiles*, BOSCH (2023), available at https://www.bosch-mobility.com/en/mobility-topics/connected-services/connected-services-for-automobiles/

[32] *Privacy Statement Robert Bosch GmbH*, BOSCH (2023), available at https://www.bosch-mobility.com/en/about-us/privacy-statement/?prevent-auto-open-privacy-settings

marketing purposes . . . and hotline services"[33];

(r)      The privacy notices also state that Bosch GmbH "use[s] marketing cookies and tracking mechanisms" if given the consumer's consent. "By using marketing cookies and tracking mechanisms, we and our partners are able to show you offerings based on your interests, resulting from an analysis of your user behavior"[34];

(s)      Bosch GmbH also uses social media platforms (*e.g.*, Instagram, LinkedIn, YouTube) communication tools to process messages from consumers sent via these social media platforms and to offer consumer support;

(t)      Privacy notices of other affiliated Bosch companies, such as Bosch Auto Service, indicate that it transfers personal information obtained from consumers visiting its website to Bosch GmbH and that it shares such data with Bosch GmbH to leverage shared services and improve its services;

(u)      Bosch GmbH also operates car service centers on a worldwide basis, including within the State of Florida. These involve a global network of 15,000 service centers in 150 countries. Bosch GmbH's website encourages consumers to book a car service by selecting on its website the appropriate country in order to get in touch with a local Bosch workshop or by directly booking an appointment at a Bosch Car Service nearby;

(v)      Bosch Car Service offers various auto repair services, including brake service. Bosch Auto Service also offers auto repair services through

---

[33] *Id.*

[34] *Id.*

22

franchise agreements with independent repair shops;

(w)     Bosch Auto Service repair services are provided at various repair shops in Florida (which Bosch characterizes as Bosch Service Centers);

(x)     Bosch Car Service centers receive parts, diagnostic equipment, and training from Bosch. Automotive repair service entities that service Ferraris in Florida have joined the Bosch family as a Bosch Service Center and have provided repair services for Ferrari-equipped Bosch systems and components, including brake-related repairs;

(y)     The Bosch Auto Service website (boschautoservice.com) contains the "Bosch Global" logo and provides that "[i]n 1921, Bosch expanded the garage concept out of Germany, creating a worldwide recognized name in automotive repair and service workshops. Bosch Auto Service utilizes technology and expertise built within the Bosch family to bring innovation to the workshop concept." The Bosch Auto Service website contains a privacy statement that indicates that it collects personal information from website users for various purposes, including technical administration of Bosch and Bosch affiliate websites, customer review and/or reports, improving Bosch and Bosch affiliates' mobile applications, products, and services in the U.S. for marketing and analytic purposes, providing customer service and responding to customer inquiries and requests;

(z)     The privacy notice also indicates that Bosch LLC may share or transfer the personal information with Bosch affiliated entities, including Bosch GmbH, "to leverage shared services and improve our Services";

(aa)    In 2015, Bosch GmbH pled guilty and paid a $57.8 million criminal fine for conspiring to fix the prices for automotive parts sold in the United States; and

(bb)    Bosch maintains a network of certified and authorized service centers that specifically service exotic cars, such as EuromotorsFL, ForeignAutoServices, and EuromotivePerformance. For example, EuromotivePerformance, a Florida exotic motor vehicle dealership servicing Ferraris, even offers a Bosch Service Credit Card that allows customers to "buy today and pay over time."[35]

51.    This Court has personal jurisdiction over Ferrari NA and Ferrari SpA through their purposeful availment and deliberate targeting of Florida residents. (1) Ferrari NA and/or Ferrari SpA sell, warrant, transport, repair, and market Class Vehicles in Florida, have authorized dealerships in Florida, and offer significant support for their authorized dealerships in Florida, including ensuring compliance with Ferrari standards, shipping parts, vehicles, and supplying personnel, and providing authorized dealerships with financing, managerial, taxation and legal support; (2) Plaintiff's action is related directly or indirectly to Ferrari's contacts with Florida as the Class Vehicle was marketed and sold to Plaintiff in Florida, the Brake Defect manifested in Florida causing injury to Plaintiff in Florida, and Plaintiff took his Class Vehicle for repair to Ferrari of Orlando; and (3) for these reasons subjecting Ferrari NA and Ferrari SpA to jurisdiction

---

[35] *See e.g.* Ferrari Service & Repair, EuromotivePerformance (2024), available at https://www.euromotiveperformance.com/ferrari-repair-ft-lauderdale/ ("We also have a long-standing background in repair and service work on Ferrari's all around the West Palm Beach, Fort Lauderdale, and the West Palm Beach region… We'll work to keep an eye on your brake pad thickness, rotor condition, and brake fluid condition. We can provide a full range of brake services, too."); *Id.,* available at https://www.euromotiveperformance.com/0-financing-available/ ("The Bosch Service Credit Card gives you the ability to buy today and pay over time.").

in Florida is reasonable and in accordance with traditional notions of fair play and substantial justice. Personal jurisdiction is also appropriate for the reasons listed below:

(a)     Ferrari NA's authorized dealership sold, shipped, and handled license and tags for Plaintiff's Class Vehicle in Florida;

(b)     Ferrari NA warranted and financed the maintenance and repairs on Plaintiff's Class Vehicle in Florida through Ferrari of Orlando;

(c)     The Ferrari Dealership was permitted access to Ferrari SpA's inventory when selling to Plaintiff in Florida;

(d)     Ferrari NA is the exclusive distributor of Ferrari automobiles, parts, and accessories manufactured by Ferrari SpA to retail dealers in the United States and Florida;

(e)     Ferrari NA distributed, sold, serviced, and/or warranted thousands of Class Vehicles, directly or indirectly, to Plaintiff and Class Members with the understanding and expectation that Class Vehicles would be sold, operated, and fit for their intended purpose across the country, including in Florida;

(f)     Ferrari NA maintains a network of authorized dealerships in Florida and provides training, leadership, financing, and warranting of Class Vehicles sold or leased through the dealership;

(g)     Ferrari SpA permits the sale of its vehicles under certain restrictions and manufactures them according to specific orders placed by customers. Ferrari supplies the vehicles it manufactures and related parts for distribution to Ferrari dealerships in Florida and ultimately to consumers in Florida;

25

(h)     Ferrari SpA shipped replacement parts and vehicles to authorized dealerships in Florida;

(i)     Ferrari SpA caused a replacement Defective Master Cylinder / Brake Booster Assembly to be shipped to Ferrari of Orlando and installed in Plaintiff's Class Vehicle;

(j)     Ferrari authorized dealerships, such as Ferrari of Orlando, are permitted to utilize Ferrari SpA's dealership database in Italy, accessing Ferrari.IT, to send options to residents and purchasers in Florida, including Plaintiff;

(k)     Ferrari SpA ships the vehicles it manufactures and the parts it supplies to various ports of entry in the United States, which, upon information and belief, also includes PortMiami in Miami-Dade County;

(l)     Plaintiff serviced his vehicle at an authorized Ferrari dealership in Orlando, and that dealership shared Plaintiff Mirti's service and ownership records with Ferrari NA and Ferrari SpA;

(m)     Plaintiff's injuries occurred in the State of Florida when driving the Class Vehicle that was sold and licensed in the State of Florida, manufactured and exported by Ferrari SpA, imported and warranted by Ferrari NA, and shipped to the authorized Ferrari dealership where Plaintiff made the purchase;

(n)     Ferrari SpA directly communicates with Class Members, including delivering welcome letters to vehicle purchasers;

(o)     Ferrari SpA directly communicated with all Florida residents and Ferrari owners in late 2023 when updating its Privacy Policies, including with

Plaintiff Mirti;

(p)    Ferrari SpA maintains a database of marketing and contact information of

United States and Florida customers;

(q)    Ferrari shares the data with Ferrari affiliates and subsidiaries ("Ferrari

Group Companies" or "Companies") so that the Ferrari Group Companies

can send customers commercial or marketing communications on products

or services that may be of interest to such customers;

(r)    Ferrari shares customers' personal data with the Companies so that the

Companies can send customers, including Plaintiff, commercial or

marketing communications on products or services that may be of interest

to them;

(s)    Ferrari NA also collects the personal data of those consumers who engage

with it;

(t)    Ferrari NA's privacy notice provides that it "may share personal

information with Ferrari and its subsidiaries and/or affiliates ('Ferrari

Group Companies') for legitimate business purposes and general business

management;[36] and

(u)    Ferrari knew of the Brake Defect as alleged herein and concealed and

omitted information from all consumer-facing labels and marketing

materials when Plaintiff was purchasing the Class Vehicle in Florida and

upon taking possession of the Class Vehicle at his home in Florida.

52.    Venue is proper in this Court under 28 U.S.C. § 1391 for all the above reasons

---

[36] Privacy Policy, Ferrari (2024), available at: https://www.ferrari.com/en-EN/privacy-policy

availing Defendants of jurisdiction in Florida, and because (i) Plaintiff resides in this District, purchased and received the Class Vehicle and services in this District, and Plaintiff's injury occurred in this District; (ii) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; (iii) this action is brought on behalf of a class of Florida purchasers and lessees, and is brought under the laws of the State of Florida; and/or (iv) a significant portion of the acts and transactions giving rise to this action occurred in this District.

## IV.    FACTUAL BACKGROUND

### A.    FERRARI AND BOSCH TOGETHER DESIGN AND MANUFACTURE THE BRAKING SYSTEMS IN THE CLASS VEHICLES AND THE DEFECTIVE MASTER CYLINDER / BRAKE BOOSTER ASSEMBLY

53.    Ferrari SpA is responsible for design, manufacture, global distribution, supply chain, investigations, and employment for the Class Vehicles and the Ferrari brand. Ferrari SpA is ultimately responsible for all things Ferrari.

54.    Ferrari SpA and Bosch GmbH together designed, developed, and tested the braking systems and the Defective Master Cylinder/Brake Booster Assembly in the Class Vehicles.

55.    Ferrari SpA and Bosch GmbH possessed exclusive access to and were in a superior position to know the facts about the Brake Defect.

56.    Ferrari NA is the wholly owned North American subsidiary of Ferrari SpA. Ferrari NA is responsible for marketing, sales, distribution, repairs, replacements, regulatory compliance, and management of Ferrari's authorized dealership network and is responsible for all things Ferrari within the United States. Ferrari NA exchanged information concerning the Defective Master Cylinder / Brake Booster Assembly with Ferrari SpA.

57.    The defective part was initially identified in Ferrari's Part 573 Safety Recall Report 21V-833 as Component Part Number 000244010 and identified as the "master cylinder/brake

booster assembly."[37] Plaintiff Mirti replaced this part in his Class Vehicle months prior to the Recalls. The defective component ("REF FERRARI 244010"), which contains both Ferrari and Bosch identifiers, is pictured below:



58.     Bosch GmbH and its subsidiaries are responsible for manufacturing the braking assembly. Ferrari SpA then installs the defective braking system used in the Class Vehicles it manufactures. Ferrari NA imports the Class Vehicles for marketing and sale in the United States. Defendants, together, operate a complex, global enterprise concerning all things "Ferrari."

**B.     THE CLASS VEHICLES ARE DEFECTIVE AND CONTINUE TO POSE A DANGEROUS SAFETY RISK TO PLAINTIFF AND MEMBERS OF THE CLASS**

**1.     A Simplified Explanation On The General Principles Of The Operation**

---

[37] Part 573 Safety Recall Report 21V-833, *supra*, note 6.

**Of The Braking System.**

59.    The Class Vehicles' braking system uses hydraulic brake fluid. The brake fluid takes the force from the depressed brake pedal, translates it into pressure, and sends this pressure to the front and rear brakes to stop a vehicle.

60.    For illustrative and explanatory purposes only, below is a diagram of a master cylinder—it is not alleged to be the same as those installed in Class Vehicles:



(a)    In general, there are two separate hydraulic circuits in a master cylinder. Each circuit supplies pressure to the calipers at two wheels. Each circuit is hydraulically independent with the exception of drawing fluid from the reservoir when at rest;

(b)    The seals for the pistons are exposed to hydraulic pressure when the brake pedal is applied. The seal at the rear end of the master cylinder for the

plunger is only to retain brake fluid and is never exposed to hydraulic pressure. The rear surface of the seal at the rear end of the master cylinder is usually exposed to vacuum from the vacuum booster;

(c) When the brake pedal is pressed, the piston moves forward of both ports and develops pressure to move the calipers, applying friction to the rotor. As the piston moves forward, fluid enters the space behind the piston, and

(d) When the brake pedal is released, the spring returns the piston rearward, and fluid enters the reservoir from behind the piston. This equalizes the pressure throughout the braking system. There is no vacuum or pressurization in the system after this occurs.

61. The braking system must compensate for brake friction material wear. As the material wears, the space between the caliper and rotor is reduced because the friction material becomes thinner. In order to keep the gap between the friction material and the rotor the same, brake fluid must enter the master cylinder from the reservoir to take up the extra volume created. When this happens, air must enter the volume of the reservoir to replace the volume of brake fluid that was used to close the gap between the friction material and the rotor. This replenishment process happens gradually over time and is not a rapid process. Rapid replenishment is not required because the friction material wears slowly.

62. As explained below, when brake fluid escapes from this braking system, the result can be a partial or total loss of braking capability.

  **2.** **The Definition of the Brake Defect, Cap and Warning Repair, and the Defective Master Cylinder/Brake Booster Assembly.**

63.     The defect is defined as follows: Class Vehicles equipped with a braking system that could potentially leak brake fluid, which may lead to partial or total loss of braking capability. (the "<u>Defect</u>" or "<u>Brake Defect</u>").

64.     As initially identified in Ferrari's Part 573 Safety Recall Report 21V-833, one of the defective components, which Bosch GmbH manufactures, is identified as the master cylinder/brake booster assembly (the "<u>Defective Master Cylinder / Brake Booster Assembly</u>").[38]

65.     Ferrari first described the Brake Defect as involving a Defective Master Cylinder / Brake Booster Assembly that caused the loss of braking capability. Ferrari observed that brake fluid had leaked into the brake booster chamber. Ferrari further warned that "[u]pon total loss of brake fluid, the vehicle would lose braking capability, which may result in injury or death to vehicle occupants."[39]

### 3.     Defendants Have Not Remedied The Brake Defect In The Class Vehicles And It Continues To Pose A Dangerous Safety Risk To Plaintiff And Members Of The Class.

66.     On July 26, 2022, after an action was filed in the District of New Jersey seeking an expansion of the recall, Ferrari recalled additional Ferrari vehicles (together with the prior recall, referred to as the "<u>Recalls</u>").[40] Ferrari also initiated recalls across the globe, including in Germany, China, and Japan, among other countries. Remarkably, the Recalls now include nearly every

---

[38] The Defective Master Cylinder / Brake Booster Assembly involves Component Part Number: 000244010, for the following models: 488 GTB; 458 Speciale Aperta; 488 Spider; 458 Italia; 458 Spider; and 458 Speciale. Discovery will reveal: (1) what other components are involved in the Brake Defect and; (2) the corresponding Component Part Number for other vehicle models.

[39] Part 573 Safety Recall Report 21V-833, *supra*, note 6.

[40] *See e.g., id.;* Part 573 Recall Report 22V-536, *supra*, note 20.

Ferrari sold in the United States since 2005.[41]

67.     Along with the expanded recall, Ferrari offered owners a purported "remedy," which involved replacing the brake fluid reservoir cap and providing a software update. The Cap and Warning Repair (defined below) cannot and has not cured the Brake Defect. If anything, it is further evidence of Defendants' scheme to defraud Plaintiff and Class Members.

68.     The repair provided in the recall does not remedy the root cause of the brake failure, as initially identified by Ferrari, nor does it remedy the original mode of failure complained of by Plaintiff.

69.     The repair offered by Ferrari as a "remedy" provides owners with a brake fluid reservoir cap replacement and an update to the software in the Class Vehicles that provides a different warning message if the vehicle should lose sufficient brake fluid ("Cap and Warning Repair"). Ferrari states that the remedy component differs from the recalled component because "the venting of the brake fluid reservoir cap has been modified."

70.     The purpose of a reservoir cap is to contain brake fluid within the braking system, allow the addition of brake fluid to the system, prevent moisture and other contaminants from entering the brake system, and provide some limited venting for the braking system to allow pressure equalization between the reservoir and the outside ambient air.

71.     Yet Ferrari identified two failure modes that can cause complete brake failure—with one failure mode affecting Part Number 000244010, which Ferrari previously identified as the defective component—involving a component separate and apart from atmospheric pressure

---

[41] Sebastian Bell, *Ferrari Recalls Almost Every Car It Sold In The U.S. Since 2005*, CARSCOOPS (Aug. 11, 2022) https://www.carscoops.com/2022/08/ferrari-recalls-almost-every-car-it-sold-in-the-u-s-since-2005/ (last accessed July 31, 2023).

within the braking system.[42] The first failure mode involves the rearmost seal (or the isolation seal) twisting out of place, which causes the brake fluid to leak from the master cylinder into the brake booster.[43] The brake fluid leak depletes the fluid levels in the primary brake circuit (front brakes), causing the primary circuit to lose braking capabilities.[44]  According to Ferrari, "[w]hen this happens, the brake capability is limited to the secondary circuit" ("Failure Mode One").[45] However, the Brake Defect may also cause failure of the secondary circuit (rear brakes), making braking capabilities "almost totally compromised." Specifically, when the rearmost seal twists, ventilation is affected, creating a vacuum inside the brake fluid reservoir that causes "the secondary circuit [to] fail" ("Failure Mode Two").[46]

72.     Despite conducting numerous tests, Ferrari has not been able to reproduce the twisting of the isolation lip seal and the movement out of its groove.

### 4.     The Cap and Warning Repair Is Ineffective, Incomplete, Subject To Delays, And May Make The Class Vehicles More Dangerous.

73.     Even more concerning, the cap replacement may have the effect of making the vehicles more dangerous and more prone to brake failure.

74.     On information and belief, third-party exotic vehicle repair centers, such as European Auto Group ("EAG"), are advising customers to retain their original brake reservoir cap.[47] The replacement cap, which comes in black as opposed to the clear or yellow caps of earlier

---

[42] RC 80 Chronology, *supra* note 10.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Brake Reservoir Cap Recall*, FERRARICHAT (2023) available at: https://www.ferrarichat.com/forum/threads/brake-reservoir-cap-recall.679582/

models, is vented. The cap possesses a rubber gasket, appearing to have a hole cut into its center, presumably with a sharp tool, and a relief slot cut into the thread area of the plastic cap. An image comparing the original and replacement cap is presented below for comparison purposes:



75.    A recent analysis by EAG across a range of Ferrari vehicles showed a noticeable variation in moisture content when the replacement cap was used compared to the older versions. According to EAG, Class Vehicles with the replacement cap consistently demonstrate a moisture content between 6 to 8 percent.[48] On the other hand, cars with the original cap show moisture levels ranging from 1 to 3 percent.[49] The latter is typically seen when the brake fluid has not been serviced for an extended period.

---

[48] *Id.*

[49] *Id.*

76.     EAG believes this discrepancy in moisture content is due to the vented opening in the new cap design.[50] The design appears to expose the brake fluid to the atmosphere inadvertently. Since brake fluid is hygroscopic, it tends to absorb moisture from the environment when exposed. With increased moisture content, the brake fluid's boiling point decreases. This can become a significant issue in hot weather or during spirited driving, potentially causing the brake fluid to boil, which could result in reduced braking performance or even total brake failure.

77.     EAG observed a considerable number of Ferrari 360, 430, and 599 models leaking brake fluid inside the cabins via the brake booster, observing that the master cylinder/brake booster assembly is a common point of failure, leaking fluid into the booster and subsequently into the cabin. EAG also stated it had replaced at least four Defective Master Cylinder / Brake Booster Assemblies.[51]

78.     In sum, the Cap and Warning is an inexpensive "quick" fix[52] that replaces one cap for another and accompanies a software update to, among other things, warn Class members of fluid leakage in their Class Vehicle. Parts for the repair remain unavailable, and some Class Members have complained of being unable to have the repair conducted.[53] And finally, those who have the Cap and Warning may still nevertheless experience partial or total loss of braking capability.[54] Ferrari's Recalls do not call for what is needed – *i.e.*, a replacement of the defective

---

[50] *Id.*

[51] *Id.*

[52] Sayan Chakravarty, *Because of a faulty $60 brake fluid reservoir cap, Ferrari is recalling more than 23,000 cars.*, LUXURYLAUNCHES (Aug. 5, 2022) https://luxurylaunches.com/transport/because-of-a-faulty-60-brake-fluid-reservoir-cap-ferrari-is-recalling-more-than-23000-cars.php.

[53] *See* Exhibit A.

[54] *See Infra* §IV.C.3.

master cylinders.

**C.   FERRARI AND BOSCH KNEW OF THE BRAKE DEFECT BUT MISREPRESENTED AND/OR CONCEALED ITS EXISTENCE**

79.     Defendants fraudulently, intentionally, negligently, and/or recklessly concealed from Plaintiff and members of the Class the Brake Defect in the Class Vehicles, even though Defendants knew or should have known of the Brake Defect in Class Vehicles.

80.     Knowledge and information regarding the Brake Defect was in the exclusive and superior possession of Defendants and their dealers. That information was not provided to Plaintiff and members of the Class. Based on pre-production testing and design failure mode analysis, production failure mode analysis, early consumer complaints made to Defendants' network of exclusive dealers, consumer complaints made online and to NHTSA, media attention when the Defect manifests, testing performed in response to consumer complaints, and a wrongful death action that Ferrari SpA sent a top engineer to investigate, among other things, Defendants were aware (or should have been aware) of the Brake Defect in the Class Vehicles and fraudulently concealed the Defect and its significant safety risk from Plaintiff and members of the Class. Defendants knew or should have known that the Brake Defect was material to owners and lessees of the Class Vehicles and was not known or reasonably discoverable by Plaintiff and members of the Class before they purchased or leased Class Vehicles.

81.     Defendants have been, and continue to be, under a legal obligation through federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them. Therefore, Defendants assiduously monitor the NHTSA–ODI website and the complaints filed therein to comply with their reporting obligations under federal law. *See* 49 CFR 573.6.

82.     Defendants knew that any defect potentially leading to loss of braking capability, such as the Brake Defect, presents a serious safety risk.

83.     Notwithstanding Defendants' exclusive and superior knowledge of the Brake Defect, Defendants failed to disclose the Defect to consumers at the time of purchase or lease of the Class Vehicles (or any time after that). They continued to sell Class Vehicles containing the Defect. Further, Ferrari failed to warn consumers and thereby permitted the resale of the Class Vehicles at artificially inflated prices in the secondary market. Defendants have intentionally concealed that the braking systems may fail and present a safety risk rather than disclosing the Defect and risk to consumers, including Plaintiff, members of the Class, and the public.

1.      **Each Class Is Certified To Be In Compliance With All Federal Motor Vehicle Safety Standards, Undergoes An Extensive Design And Manufacturing Process, And Is Subject to Rigorous Pre-Production Testing.**

84.     Each Class Vehicle is painstakingly designed and manufactured at Ferrari's factory in Maranello, Italy, where each vehicle undergoes extensive pre-production testing, including in racing conditions. Before export to the United States, the Class Vehicles are certified to comply with all statutory regulations in the United States. Plaintiff and the Class relied on Ferrari's reputation, as well as the certifications and representations of Ferrari SpA and Ferrari NA in making their purchasing decision.

85.     After production and testing, when importing the Class Vehicles into the United States, Ferrari must comply with the stringent requirements of NHTSA. Ferrari must:

(a)     Submit a letter to NHTSA designating an agent for service of process and a letter from the agent accepting the designation if the manufacturer is not located in the United States (49 CFR 551.45);

(b)     Submit to NHTSA information the agency will need to decipher the manufacturer's vehicle identification number or "VIN" format no later than 60 days prior to offering the first vehicle for sale in the United States (49

CFR Part 565, "Vehicle Identification Number Requirements");

    (c)    Submit a letter to NHTSA identifying the manufacturer's name, address, and the products it manufactures that are subject to the Federal motor vehicle safety standards no later than 30 days after manufacturing begins (49 CFR Part 566, "Manufacturer Identification"); and

    (d)    Permanently affix to the vehicle, in a prescribed location, a certification label meeting the requirements of 49 CFR Part 567, "Certification."

86.    These requirements include that Ferrari certify that the Class Vehicles meet applicable braking regulations in the United States and that they are safe to drive by consumers, which includes Plaintiff and the Class.

87.    Federal regulations also require manufacturers like Ferrari to test their components and systems to confirm they can meet specific minimal standards. The regulations require testing of components and systems and mandate system redundancies if and when a brake system fails.

88.    Federal Motor Vehicle Safety Standard ("FMVSS") 105 specifies minimum performance requirements for hydraulic and electric service brake systems and associated parking brake systems. The purpose of FMVSS No. 105 is "to insure safe braking performance under normal and emergency conditions" and applies to "multi-purpose passenger vehicles," 49 CFR § 571.105, S2, S3.

89.    FMVSS 105 states, "[e]ach vehicle must be equipped with a service brake system acting on all wheels." *Id.* at S5.1. Under S5.1.2 *Partial failure*, in the event of partial brake failure, each vehicle must:

    S5.1.2.1    In vehicles manufactured with a split service brake system, in the event of a rupture or leakage type of failure in a single subsystem, other than a structural failure of a housing that is common to two or more subsystems, the remaining portion(s) of the service brake

system shall continue to operate and shall be capable of stopping a vehicle from 60 mph within the corresponding distance specified in column IV of table II.

S. 5.1.2.2   In vehicles not manufactured with a split service brake system, in the event of any one rupture or leakage type of failure in any component of the service brake system the vehicle shall, by operation of the service brake control, be capable of stopping 10 times consecutively from 60 mph within the corresponding distance specified in column IV of table II.

90.   Concerning the master cylinder component, FMVSS 105 also states under S5.4.1 that "[a] master cylinder shall have a reservoir compartment for each service brake subsystem serviced by the master cylinder. Loss of fluid from one compartment shall not result in a complete loss of brake fluid from another compartment." As described above, the Brake Defect is subject to Failure Mode One and Failure Mode Two and is thus in violation of FMVSS 105.

91.   FMVSS 105, S5.6 states concerning "Brake System Integrity" that "[e]ach vehicle shall be capable of completing all the performance requirements of S5 without—

(a)   Detachment or fracture of any component of the braking system, such as brake springs and brake shoe or disc pad facing, other than minor cracks that do not impair attachment of the friction facing. All mechanical components of the braking system shall be intact and functional. Friction facing tearout (complete detachment of lining) shall not exceed 10 percent of the lining on any single frictional element.

(b)   Any visible brake fluid or lubricant on the friction surface of the brake, or leakage at the master cylinder or brake power unit reservoir cover, seal and filler openings.

92.   Similarly, FMVSS 135 specifies requirements for service brakes and associated parking brake systems. The purpose of FMVSS 135 is to ensure safe braking 49 CFR § 571.135,

S1, S2. FMVSS 135 and FMVSS 105 are similar in many ways, indeed, as described in an August

27, 2019, letter from Robert Bosch LLC[55] to the Deputy Administrator of NHTSA:

> FMVSS 135 and FMVSS 105 (Hydraulic and Electric Brake Systems): Bosch would also like to highlight the inherent similarities between FMVSS 135 and FMVSS 105. Although the procedures and performance criteria of each requirement differ in several ways, the barriers for the validation of an ADS-DV are substantially similar. Each of the comments provided in this response concerning the validation of FMVSS 135 will apply to vehicles subjected to FMVSS 105.

93.     FMVSS 135 states that in regard to Reservoirs, each vehicle shall:

S5.4.1.     ***Master cylinder reservoirs.*** A master cylinder shall have a reservoir compartment for each service brake subsystem serviced by the master cylinder. Loss of fluid from one compartment shall not result in a complete loss of brake fluid from another compartment.

S5.4.2.     ***Reservoir capacity.*** Reservoirs, whether for master cylinders or other type systems, shall have a total minimum capacity equivalent to the fluid displacement resulting when all the wheel cylinders or caliper pistons serviced by the reservoirs move from a new lining, fully retracted position (as adjusted initially to the manufacturer's recommended setting) to a fully worn, fully applied position, as determined in accordance with S7.17(c) of this standard. Reservoirs shall have completely separate compartments for each subsystem except that in reservoir systems utilizing a portion of the reservoir for a common supply to two or more subsystems, individual partial compartments shall each have a minimum volume of fluid equal to at least the volume displaced by the master cylinder piston servicing the subsystem, during a full stroke of the piston. Each brake power unit reservoir servicing only the brake system shall have a minimum capacity equivalent to the fluid displacement required to charge the system piston(s) or accumulator(s) to normal operating pressure plus the displacement resulting when all the wheel cylinders or caliper pistons serviced by the reservoir or accumulator(s) move from a new lining, fully retracted position (as adjusted initially to the manufacturer's recommended setting) to a fully worn, fully applied position.

---

[55] Although this letter was addressed from Robert Bosch LLC, the letter also states that Bosch is utilizing the intellectual property of "Robert Bosch GmbH, Germany." This letter from Bosch provides feedback to NHTSA to develop a proposal to amend the Federal Motor Vehicle Safety Standards. Again, showing that Robert Bosch GmbH acts through its U.S. subsidiaries as its agents and alter egos to coordinate and comply with U.S. regulatory authorities.

94.     Under FMVSS 135 S5.6, each vehicle must also maintain its brake system integrity, stating that each vehicle shall meet the complete performance requirements of this standard without:

(a)     Detachment or fracture of any component of the braking system, such as brake springs and brake shoes or disc pad facings other than minor cracks that do not impair attachment of the friction facings. All mechanical components of the braking system shall be intact and functional. Friction facing tearout (complete detachment of lining) shall not exceed 10 percent of the lining on any single frictional element.

(b)     Any visible brake fluid or lubricant on the friction surface of the brake, or leakage at the master cylinder or brake power unit reservoir cover, seal, and filler openings.

95.     Ferrari was also required to fill out and submit a DOT HS-7 Declaration for Motor Vehicles Importation when importing the Class Vehicles into the United States. This Declaration filed with Customs for motor vehicles and motor vehicle equipment items imported into the United States are subject to the Federal motor vehicle safety, bumper, and theft prevention standards. Under 49 U.S.C. § 30112(a), "no person shall, among other things, import any motor vehicle or motor vehicle equipment manufactured on or after the date an applicable FMVSS takes effect unless the vehicle or equipment complies with the standard and is covered by a manufacturer's certificate of compliance."

96.     Moreover, each Defendant has an ongoing obligation to report the true nature of the Defect to NHTSA under 49 CFR 573.6(a) and (b), which state:

Each manufacturer shall furnish a report to the NHTSA for each defect in his vehicles or in his items of original or replacement equipment that he or the Administrator determines to be related to motor vehicle safety, and for each noncompliance with a motor vehicle safety standard in such vehicles or items of equipment which either he or the Administrator determines to exist.

…

42

Each report shall be submitted not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist.

97.     Under these standards, the Class Vehicles should not experience partial or total loss of braking capability. Upon learning that the Cap and Warning Repair was an insufficient remedy, Defendants Ferrari NA, Ferrari SpA and Bosch GmbH were legally required to inform NHTSA of this defect related to motor vehicle safety and failed to do so. Given these regulations and the common law fiduciary relationship implied between Ferrari and its customers, Ferrari had an absolute duty to mitigate the Brake Defect and, at minimum, disclose the existence of the Brake Defect to the Class before sale and mitigate the potentially horrific consequences of a failure.

      **2.**    **Ferrari Spa Sent A Technical Engineer To Examine A Failed Vehicle In 2016 Who Testified The Braking System In The Class Vehicles Is Operative Even In Case Of Failure Of The Brake Booster Vacuum, Ferrari NA Has Also Been Involved In Domestic Litigation.**

98.     Multiple cases have arisen of crashes involving the Class Vehicles with claims that the brakes failed, resulting in the loss of control over a Class Vehicle.

99.     Most tragically, at about 7:48 A.M. on June 9, 2015, Robert Ebert, the former head of equities for Asia Pacific at Deutsche Bank, reported a "catastrophic failure of the brakes" when his 2012 Ferrari 458 Spider hit and killed Ku Lap-chi, 53, at the entrance to a car park.[56] Mr. Ebert was driving from his home in the Peak District of Hong Kong to his office at the International Commerce Centre on the day of the accident.

---

[56] *Bank executive arrested after wayward Ferrari kills guard in TST*, EJINSIGHT, June 10, 2015, https://www.ejinsight.com/eji/article/id/1073304/20150610-bank-executive-arrested-after-wayward-ferrari-kills-guard-in-tst; Chris Lau, *Brakes on Ferrari that fatally hit security guard worked fine, Hong Kong court hears*, SOUTH CHINA MORNING POST, July 27, 2016, https://www.scmp.com/news/hong-kong/law-crime/article/1995539/brakes-ferrari-fatally-hit-security-guard-worked-fine-hong.

100.    Mr. Ebert argued, in his defense, that he was a man with a clear record in Hong Kong and the United Kingdom; he obtained his driving license in 1984, 32 years ago at that time; he never had a speeding ticket nor had an accident; and that over the years, he owned many high-performance sports cars. Mr. Ebert further argued that there was a failure in his Ferrari's brake booster system and that CCTV footage had captured an image of his brake lights engaged prior to the crash—proving he was attempting to slow the vehicle. Mr. Ebert further argued that if his brakes were working correctly, he would have had plenty of time and distance to slow down to drive around the bend he was approaching at about 25 km/hr—which was his intention. However, he could not stop his vehicle, nor could he slow it down enough to safely negotiate the corner.

101.    Upon learning of a death caused by an alleged "catastrophic failure of the brakes," Ferrari SpA was obligated to conduct an in-depth investigation into the claims to determine the truth of the allegations. Any failure by Ferrari SpA to investigate would have been willfully blind and/or reckless to severe allegations that threaten the lives and safety of Plaintiff and Class Members. Notwithstanding this obligation, Ferrari SpA sent a Technical Engineer, Martino Casolari, to testify before the court in Hong Kong. In so doing, Mr. Casolari submitted an expert report to the Court providing technical analysis reports and homologation testing. The judge, relying on Mr. Casolari (who she found "credible and reliable" and his reasoning and explanations "clear and convincing"), found the brakes could not have been defective because the vehicles are tested to comply with a regulation acting as a safeguard in the braking systems.[57]

---

[57] Similarly, on January 6, 2018, a Ferrari 458 Spider crashed in Bath, United Kingdom. Anthony Bohana, an individual purporting to be the owner of that vehicle, corroborated Mr. Ebert's testimony, stating:

> Same thing happened to me in my 458 Spider ... this was the result https://www.bathchronicle.co.uk/news/bath-news/ferrari-worth-200000-crashes-garden-1021566 Ferrari deny and deny it ... BUT they know the truth, I actually

102.    As necessary background, Hong Kong regulations mirror vehicle safety standards set by the United Nations Economic Commission for Europe ("UNECE"). The World Forum for Harmonization of Vehicle Regulations is a working party ("WP.29") of the Inland Transport Committee of the UNECE. The core of the WP.29's work is based around a 1958 Agreement, formally titled "Agreement concerning the adoption of uniform technical prescriptions for wheeled vehicles, equipment and parts which can be fitted and/or be used on wheeled vehicles and the conditions for reciprocal recognition of approvals granted on the basis of these prescriptions" (E/ECE/TRANS/505/Rev.2, amended on 16 October 1995). This forms a legal framework wherein participating countries agree on a standard set of technical prescriptions and protocols for type approval of vehicles and components. These were formerly called "UNECE Regulations" or, less formally, "ECE Regulations" in reference to the Economic Commission for Europe.

103.    As reasons for the verdict in Mr. Ebert's case, the trial judge had cited Mr. Casolari's expert report with respect to regulation ECE R 13 H, which she said was a "safeguard in brake system that is operative even if the brake booster vacuum fails." Mr. Casolari, Ferrari SpA's representative, said:

> The vehicle braking system is operative even in case of failure of the brake booster vacuum. This is a legal safety requirement based on homologation regulation ECE R 13 H also valid in Hong Kong; according to the said homologation regulation a minimum stopping distance must be granted.

---

think myself lucky some poor guy I spoke to had the same problem but killed someone in Hong Kong .. he served 2 years in prison for it .. yet he is adamant the brakes failed and he could not stop the car .. I 100% believe him after it happened to me.

*See Need advice on 458 braking issue, or lack there of....* FERRARICHAT https://www.ferrarichat.com/forum/threads/need-advice-on-458-braking-issue-or-lack-there-of.576984/.

> During the homologation type – approval process of the brake system of the 458 Ferrari model has been tested to evaluate the behaviour of the vehicle in case of failure. The said homologation test is aimed at measuring the stopping distance.
>
> In particular, in case of failure of the brake booster vacuum, the homologation requirement prescribes that the vehicle must come to a full stop within 168m – from a speed of 100 km/h by applying a force on the brake pedal of 500 N.

In finding Mr. Ebert guilty, the Judge stated. "[t]here is no dispute the brake still function even if the brake booster fails but only if the force on the brake pedal by a kick or slam achieves a deceleration rate that is meaningful." Yet if the Class Vehicles are in violation of these government standards, then the brakes *do not* function even if the brake booster fails.

104.    The U.S. FMVSS 105 and FMVSS 135 closely track ECE R13H, and essentially, these requirements mandate that service brakes must be able to stop each vehicle in a series of tests at certain distances, speeds, brake pedal forces, and decelerations. Vehicles must be able to stop under partial failure of the service brake system, inoperative brake power assist or brake power unit, anti-lock failure, variable ratio valve failure, and with the engine off. As has now become publicly available in the NHTSA database sometime after February 2023, Ferrari identified two failure modes that can cause complete brake failure. When the rearmost seal (or the isolation seal) twists out of place, which causes the brake fluid to leak from the master cylinder into the brake booster, or when atmospheric pressure is affected within the system (Failures Modes One and Two), in other words, Mr. Ebert's Class Vehicle may have violated ECE R13H, just as the Class Vehicles violate FMVSS 105 and FMVSS 135.

105.    Domestic litigation that has directly implicated Defendants also ensued, which should have put Defendants on notice of the Defect. *See e.g., Joel Saban, et al. vs. Ferrari North America, et al.*, Docket No. 2020CV000961 (Wis. Cir. Ct. Jul 07, 2020); *Joel Saban, et al. vs. Ferrari North America, et al.*, Docket No. 2021CV000087 (Wis. Cir. Ct. Mar 10, 2021). Ferrari

NA was involved in litigation in the State of Wisconsin, Circuit Court, Waukesha County, in a case filed on July 20, 2020—and answered that complaint on November 5, 2020. Plaintiffs Joel Saban and The Travelers Home and Marine Insurance Company brought suit to recover against Ferrari NA and others the costs associated with a 2010 Ferrari 458 Italia (VIN: ZFF67NFA8A0174372) purchased by Joel Saban. On July 7, 2017, plaintiff Joel Saban was operating this vehicle at Road America, Elkhart Lake, WI, when the brakes in his vehicle failed, causing the vehicle to crash into a barrier at the edge of the track, causing damage to the vehicle.[58]

106.    Plaintiffs in the *Saban* Action alleged that Ferrari NA failed to warn of the defect and that it was Ferrari NA's failure to warn that was a proximate cause of the accident and resulting damage. Within ninety (90) days of Joel Saban receiving the recall notice from Ferrari NA ("[C]lient [received] recall notice from Ferrari the day after Expert deadline. Brake issue is consistent [with] what client claims he encountered."), the *Saban* Action was settled with a stipulation of dismissal.

107.    Another example, in the fall of 2012, James Lee and his wife, Tan Siok Yin, left Singapore to vacation in Las Vegas. Before leaving, the couple decided they wanted to drive high-performance vehicles at high speeds while vacationing at a speedway. The pair decided to rent a 2012 Ferrari 458 Italia, and they were paired with a professional driving instructor, Brandon Grade.

108.    After entering the vehicle, Lee started the engine, accelerated towards the track's first turn, and sped onto the second turn. As the turn approached, Lee hit the brakes. But the brakes failed. Fortunately, the 2012 Ferrari 458 Italia was also equipped with a passenger-side brake pedal. Grade, the professional driver, hit the brakes. But the brakes failed again—once again,

---

[58]   Plaintiff purchased his vehicle after the date of the Wisconsin incident, and likely before The Travelers Home and Marine Insurance Company engaged in an informal dispute resolution process on its subrogation claim.

evidencing that the Brake Defect can cause multiple failure modes in violation of FMVSS 105. The wall drew closer. The vehicle crashed, and Lee was severely injured. On August 8, 2013, Lee and his wife commenced a negligence action against the professional driver and the rental company for the Ferrari. *See* S*un v. Dreamdealers USA, LLC*, 2:13-CV-1605-JCM-VCF (D. Nev.). Ferrari is likely to have learned of this action through the rental company or monitoring of legal actions under sound practices of liability monitoring.[59]

### 3.  Consumer Complaints To NHTSA.

109.    NHTSA provides a repository for motor vehicle owners to report complaints relating to safety defects that pose a risk of accidents in vehicles manufactured or imported in the United States, including safety defects relating to brake malfunctions. The safety defect complaints are entered into the NHTSA consumer complaint automated database, which is accessible to manufacturers and is routinely reviewed by Ferrari soon after the submission of each complaint. NHTSA also provides these consumer complaints to the vehicle manufacturers directly, including Ferrari. Given that the vast majority of owners of Class Vehicles are not aware of NHTSA and/or its reporting system, complaints received by NHTSA form only a tiny minority of the overall number of complaints that have been made to Ferrari directly and/or through its authorized dealerships, including through the form of warranty repairs.

110.    Below, for illustrative purposes, are a sampling of complaints made to the NHTSA:

Model/Year:   2010 Ferrari 458 Italia
NHTSA ID:     11195454
Incident Date: December 29, 2018
Report Date:  April 10, 2019
Location:     San Jose, CA

---

[59] A number of owners have also publicly claimed that they were engaged in domestic and international litigation with Ferrari NA or Ferrari SpA, that either was litigated in state court, foreign courts, or settled privately prior to filing a summons and complaint. Discovery will enable Plaintiff to determine the number of actions that have been litigated concerning the Brake Defect.

VIN Number: ZFF67NFA0A0****

A few occurrences of applying the brake, but the brake pedal barely moves further (hard brake feel) but the car does not slow down. Has occurred going forward at slow speeds. However next brake application is normal. Perhaps issue with brake boost[er]?

---

Model/Year:    2018 Ferrari 488 GTB
NHTSA ID:     11433534
Incident Date: June 4, 2021
Report Date:   September 19, 2021
Location:      Unknown
VIN Number:   ZFF79ALA2J0****

On 6/4/21, my 2018 Ferrari 488 GTB displayed a message in my left dash instrument panel prior to complete brake failure in my driveway that read "brake fluid low-drive to dealer slowly", that resulted in my Ferrari being totaled by State Farm after I jumped out of the running and moving Ferrari onto my rear lawn between 10 to 15 miles per hour before it went into a pond behind my residence. Then, 6-weeks later the replacement 2018 Ferrari GTB VIN#[XXX] I purchased from Ferrari of Atlanta displayed the same message in my left dash instrument panel that read "brake fluid low-drive to dealer slowly before the brake pedal went completely to the floor as I was pulling into my garage. After having the replacement Ferrari towed into Continental Ferrari it was determined that the brake fluid had leaked inside the brake booster that caused the brake failure on the replacement Ferrari. The first Ferrari was taken to a company and sold as salvage. The company name is Copart and their telephone number is (314) 291-8400. None of the Ferrari service departments or sales departments that I contacted had any record or knowledge of the brake failure problems that I experienced within a 6-week period on 2 separate Ferrai 488 GTB's. I could have been trapped inside my Ferrari that went into the pond behind my residence and possibly killed. I could also have been injured or killed along with other motorists in my replacment Ferrari that had the same brake failure issue just 6-weeks later if I was unable to get the replacement Ferrari home and safely inside [m]y garage before the brakes completely failed a second time. I don't understand why Ferrari has the message "brake fluid low-drive to dealer slowly" display[] that gives drivers a false sense of security that the brakes will continue to work properly until you drive to the dealer. That's a deadly warning and major safety concern to me. My cell number is [XXX] and I live in the St. Louis area. Please call me! Information redacted pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. 552(B)(6).

---

Model/Year:    2018 Ferrari 488 Spider
NHTSA ID:     11435451
Incident Date: September 7, 2021

Report Date:   October 4, 2021
Location:       Vero Beach, FL
VIN Number:  ZFF80AMA0J0****

On 07 September 2021, I had been driving my 2018 Ferrari 488 Spider for 8 to 10 miles when the car suddenly displayed the following message "Brake Fluid Low, Go to Dealer Slowly". (note: Dealer is 2 hours away at 60 mph). As I slowed the car from approximately 45 mph, the brakes felt minimal but with down-shifting and minimal brakes I was able to slow the car. I attempted to limp home at 5 to 10 mph however within 3 miles or so the brakes failed completely. With the pedal to the floor there was absolutely no effect on the vehicle. It was fortunate that I was able to slow the car prior to complete failure and did not hit anything or anyone. Once the brakes failed completely, I did end up running through a stop sign before I could pull off the road into a parking lot and only stopped the car by rolling into an uphill parking spot and hitting the concrete parking barrier with the tires. I found it was necessary to turn the car off in order to keep it from rolling backwards. The car does not have a classic emergency brake but rather an electronic hold function. When trying to activate this function to keep the car from rolling backwards the car displayed the following message (as best I can remember) "Depress Brake Pedal to Activate Hold". However, with the brake pedal fully depressed, the function would not activate even though it worked fine prior to the brake failure (and subsequent to repair). The car was towed to the dealer and repaired under warranty. The service manager reported that the Master Cylinder leaked into the vacuum booster. I had requested that the failed parts be returned to me however the service manager advised me that failed parts replaced under warranty are returned to Ferrari.

Model/Year:   2018 Ferrari 488 GTB
NHTSA ID:    11448032
Incident Date: November 1, 2021
Report Date:   January 19, 2022
Location:       Reno, NV
VIN Number:  ZFF79ALAXK0****

The contact owns a 2019 Ferrari 488 GTB. The contact received notification of NHTSA Campaign Number: 21V833000 (Service Brakes, Hydraulic) however, the part to do the recall repair was unavailable. The contact called the local dealer and it was confirmed that parts were not yet available. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The contact stated that he was concerned about driving the vehicle. The manufacturer was not notified. The contact had not experienced a failure. Parts distribution disconnect.

Model/Year:   2017 Ferrari 488 GTB
NHTSA ID:    11482908
Incident Date  September 4, 2022

Report Date:   September 5, 2022
Location:        Austin, TX
VIN Number:  ZFF79ALA0H0****

On Sunday Sept 4th, while attending an Edge Addicts track day event at Circuit of the Americas in Austin, My 2017 488 was part[] of the run group, 2 laps were completed prior to the brake pedal failing completely to the floor and causing my driver to loose all braking capability and slamming into a wall. We have in car video from Go Pro footage, footage from another vehicle from behind my 488 and also footage from the control room of the track. This vehicle was purchased 3 months ago, the brake fluid is at the correct level and the new "Recalled" Brake fluid cap is installed. There is some sort of serious manufacturing defect with this system, this is a car designed for this type of use. This needs a serious investigation before others are hurt or killed.

111.    Federal law requires automakers like Ferrari to be in close contact with NHTSA regarding potential defects. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000). Accordingly, Ferrari NA monitors NHTSA databases for consumer complaints regarding their automobiles as part of their obligation to identify potential defects in their vehicles, such as the Brake Defect. Ferrari NA communicates with Ferrari SpA concerning any issues that arise in the Class Vehicles in order to design better products, ensure customer satisfaction, and protect against legal liabilities. Ferrari SpA and Bosch GmbH similarly correspond regarding defective components.

112.    From its monitoring of NHTSA databases, Ferrari knew or should have known of the Brake Defect complaints lodged, such as those quoted above.

### 4.    Ferrari Monitors and Reviews Consumer Feedback and Customer Complaints, An Essential Practice In Maintaining A Luxury Brand.

113.    Defendants knew about the Defect due to consumer complaints made online and internally to their exclusive network of dealers, which Defendants monitor as part of a continuous obligation to identify potential defects in their vehicles.

114.    Defendants knew about the Brake Defect through monitoring complaints identifying the Defect, which were posted before Plaintiff and Class Members purchased or leased

their Class Vehicles. These postings regarding the Brake Defect in the class vehicles appeared in online forums, such as FerrariChat, which is part of Motorsport Network LLP.

115.    As FerrariChat is one of the most significant resources for Ferrari owners, a number of authorized Ferrari dealerships (which as described herein are alter egos/agents of Ferrari NA) are sponsors and advertisers for the website, including (1) Boardwalk Ferrari, 6300 International Pkwy, Plano, TX 75093; (2) Continental Autosports, 420 E. Ogden Ave. 006120, Hinsdale, Dupage, 60521, IL, US; (3) Ferrari Maserati of Fort Lauderdale, 5750 N Federal Hwy, Fort Lauderdale, FL 33308; and (4) Prancing Horse of Nashville, 2320 Knights of Columbus Blvd, Nashville, TN 37217.

116.    These authorized dealerships advertise and sponsor FerrariChat because they are aware it is a repository for customer complaints and recognize it as a meeting place for consumers. A sampling of complaints made online in FerrariChat is annexed hereto as Exhibit A to the Complaint.

### 5.    Highly Publicized Manifestations Of The Defect In The Media.

117.    Defendants are also aware of the Defect from highly publicized media coverage that warranted investigation by the Ferrari Defendants.

118.    On information and belief, Ferrari became aware of the incidents below either through media coverage, warranty and insurance claims, industry knowledge, and/or litigation and indemnifications. Ferraris are valuable and exclusive automotive machines, and catastrophic incidents draw attention from the public and interested parties. Below are three illustrative examples that drew media attention.

119.    On April 8, 2018, a highly public crash occurred of Ferrari 488 GTB at Autódromo Fernanda Pires da Silva in Estoril, Cascais, Portugal ("Estoril Circuit"). Estoril Circuit was the home of the Formula One Portuguese Grand Prix from 1984 to 1996, and on information and

belief, Ferrari SpA—as a world-renowned motorsport company—is intimately familiar with the track and personnel there.

120.    While participating at Estoril Circuit, the vehicle reportedly suffered catastrophic brake failure at one of the circuit's high-speed sectors and slammed into a crash barrier.[60] Footage shows that as another vehicle on track begins to brake, the Ferrari 488 GTB continues to enter the corner at full speed, with the driver scrambling into the off-track area to avoid other cars.[61] The driver reportedly stated that he lost braking capability in his vehicle—the organizers put out a statement blaming an unspecified mechanical issue, as well as making a statement below:[62]

**Estoril Experience Day – April 8**

Organization's announcement

Yesterday's track day was marked by a major accident at curve 1 of the Estoril Circuit, caused by a technical problem in the vehicle that crashed into the tire barrier at over 200km/h, of which we highlight the following facts:

- The Estoril Circuit infrastructure, rails and tire barriers, perfectly fulfilled their function by absorbing the impact of the car;

- The ambulance and medical team arrived at the scene 1m30s after the impact, observing the driver and occupant and then taking them to the circuit's medical centre, which is duly equipped;

---

[60]   Almeida, Lucio, *Ferrari Crash Estoril 8 Abril 2017* (2017), available at: https://www.youtube.com/watch?v=AmMckOZBlgY

[61]   This story was picked up by multiple news sources: Brad Anderson, *Ferrari 488 Wrecked In High Speed Crash At Estoril Circuit*, CARSCOOPS, April 10, 2017 https://www.carscoops.com/2017/04/ferrari-488-wrecked-in-high-speed-crash/#more;     James Fossdyke, *Ferrari Driver's Escape In Sickening Crash Shows Just How Safe Prancing Horses Are*, SUPERUNLEADED, April 12, 2017 http://superunleaded.com/sickening-ferrari-crash-shows-best-good-brakes/23347/ (last accessed: Jan. 17, 2024; Kyle Cheromcha, W*atch Separate Crashes Claim Two Ferrari 488s This Weekend*, THEDRIVE, April 9, 2017, https://www.thedrive.com/news/9132/watch-separate-crashes-claim-two-ferrari-488s-this-weekend.

[62]   https://www.facebook.com/photo/?fbid=776215979203879&set=a.295524863939662.10737418 30.284228151736000

- Two vehicles from the Motor Clube do Estoril, out of several present along the circuit, needed 10 seconds to reach the accident site as they were meters from the accident site;

- A firefighters extrication team was also present in case it was necessary to remove passengers from the vehicle;

- The team of stewards from Motor Clube do Estoril cleaned and reconstructed the tire barrier in 40 minutes, thus ensuring the continuity of the event.



121.    Similarly, on January 6, 2018, a Ferrari 458 Spider lost braking capability and crashed into the front garden of a home in Bath, United Kingdom. The vehicle was worth approximately £200,000. According to the owner of the house, who was awoken by the sound of the crash, the driver said that he lost control of the vehicle, pictured below. "My husband and son were awake and heard the crash… it woke me up and I ran straight down, checked the driver was ok.[63] Police attended the scene, and the Ferrari 458 Spider was later recovered around 12.30 pm.

---

[63] Andrew Baber, *Ferrari worth £200,000 crashes into garden of Bath home after driver 'lost control'*, BATH CHRONICLE, Jan. 6, 2018, https://www.bathchronicle.co.uk/news/bath-news/ferrari-worth-200000-crashes-garden-1021566.



122.    Anthony Bohana, an individual purporting to be the owner of that vehicle, corroborated Mr. Ebert's testimony. Mr. Bohana stated:

> Same thing happened to me in my 458 Spider ... this was the result https://www.bathchronicle.co.uk/news/bath-news/ferrari-worth-200000-crashes-garden-1021566 Ferrari deny and deny it ... BUT they know the truth, I actually think myself lucky some poor guy I spoke to had the same problem but killed someone in Hong Kong .. he served 2 years in prison for it .. yet he is adamant the brakes failed and he could not stop the car .. I 100% believe him after it happened to me.[64]

123.    Likewise, since the Recalls began, on July 21, 2022, a Ferrari 488 GTB was involved in a catastrophic crash in Hanoi, Vietnam.[65] Local media reported that the vehicle was part of the batch recalled by Ferrari due to braking failure and was supposed to be repaired toward the end of September. The vehicle was driven by a Volvo Hanoi technician, who test drives all sorts of vehicles before they get delivered to their customers. The man appears to have lost control

---

[64] *See Need advice on 458 braking issue, or lack there of....* FERRARICHAT, Page 1, Message Number 11 https://www.ferrarichat.com/forum/threads/need-advice-on-458-braking-issue-or-lack-there-of.576984/.

[65] Gnaticov, Cristian, *Ferrari 488 GTB Takes Out Tree in Vietnam, Could've Been Due to Braking System Failure*, AUTOEVOLUTION (Aug. 13, 2022), available at: https://www.autoevolution.com/news/ferrari-488-gtb-takes-out-tree-in-vietnam-could-ve-been-due-to-braking-system-failure-195556.html.

of the vehicle in Hanoi's Long Bien District, and the Ferrari 488 GTB then climbed the curb and

took out a tree that was reinforced. A photo of the wreckage is provided below:



      **6.**      **Post-Failure Mode Analysis, Warranty Claims, And Reports From Authorized Dealerships.**

124.     Ferrari SpA and Bosch GmbH go to great lengths to conduct post-failure analysis

on failed vehicles and component parts. First and foremost, such analysis is crucial for a

manufacturer to identify and understand the root cause of the failures. This information is vital for

ensuring the safety and reliability of their products, as it allows them to address any design,

manufacturing, or engineering flaws that may have led to the failures in the first place. By

conducting post-failure analysis, manufacturers can take proactive measures to prevent similar

incidents from occurring in the future, thus safeguarding their reputation and maintaining consumer trust.

125.    Similarly, conducting analyses on warranty claims and reviewing dealership feedback is essential for successful business operations. Consider the vast amount of data that manufacturers receive from warranty claims every year, such as part or model numbers and manufacturing dates, and complaints or problem descriptions from customers. This valuable information is not only a rich source of potential insight into how products function in the real world and what is not working for customers – but it can ultimately be used to decrease the number of warranty claims.

126.    Simply put, post-failure analysis, review of warranty claim data, and oversight of dealership feedback are essential for complying with regulatory requirements and industry standards. Automotive manufacturers are subject to strict regulations and safety standards imposed by government agencies and industry organizations. Conducting thorough analyses on failed vehicles allows manufacturers to demonstrate compliance with these standards and helps avoid potential penalties or legal consequences for non-compliance. By being proactive in identifying and rectifying issues, manufacturers can continue selling their vehicles in the market.

127.    On information and belief, Ferrari and Bosch became aware of the Brake Defect through aggregation of the above information, part traceability reports, and communications with one another and authorized dealerships. It is important and telling that Ferrari NA has admitted that it was able to use this data to find evidence of similar incidents involving the Brake Defect, including as follows: one case of brake fluid loss on a Ferrari FF in December 2012, one case on a Ferrari FF in May 2020, one case on a GTC4 Lusso in July 2020, one case on an 812 Superfast in July 2021, one case on a 488 Pista Spider in February 2022, one case on a 488 Pista in February

2022, one case on an 812 Superfast in February 2022, one case on an 812 Superfast in March, 2022 and one case on a 812 Superfast in April, 2022.[66]

       **7.**    **Ferrari And Bosch Monitored The Above Information And Knew Of The Existence Of The Brake Defect.**

128.    As evidenced by the preceding paragraphs, the Defendants were aware of the Brake Defect for many years before they issued the Recalls. Defendants also knew that the Defect posed a severe safety risk to Class Members and the public at large, the associated costly repair charges to the Class Vehicles, and the potential harm to their reputations and brand should their fraud be uncovered.

129.    Defendants' deceptive acts, misrepresentations, and/or omissions regarding the Brake Defect create a safety risk for drivers and occupants of the Class Vehicles as well as members of the public who may be involved in accidents with Class Vehicles that experience the Brake Defect while driving. The reasonable expectation that the Class Vehicles are safe and reliable to drive is and was material to Plaintiff and members of the Class at all relevant times.

130.    Defendants monitored and saw the above-quoted consumer complaints for three reasons:

    (a)    First, pursuant to the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), 49 U.S.C. § 30118, manufacturers are required to monitor reports submitted to NHTSA and report information regarding internal customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects.

---

[66] RC 80 Chronology, *supra*, note 10.

(b)     Second, car manufacturers, like Defendants, know that NHTSA is a repository for complaints and, as such, provides an early warning mechanism for responding to design or manufacturing defects that pose a safety hazard. Hence, as courts have found, it is entirely reasonable to assume that car manufacturers closely monitor and analyze complaints made online and to NHTSA—mainly when they entail safety hazards.

(c)     Third, online reputation management (commonly called "ORM" for short) is now a standard business practice among most prominent companies. It entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[67] The growth of the internet and social media and the advent of reputation management companies have led to ORM becoming an integral part of many companies' marketing efforts. Defendants regularly monitored consumer complaints in connection with their ORM activities because candid comments from Ferrari owners provided valuable data regarding quality control issues and customer satisfaction.

---

[67] Moryt Milo, *Great Businesses Lean Forward, Respond Fast*, SILICON VALLEY BUSINESS JOURNAL (September 5, 2013), http://www.bizjournals.com/sanjose/print-edition/2013/05/17/great-businesses-lean-forward-respond.html

131.    Moreover, Ferrari is a high-end brand. As such, every touch point of the brand has an impact on customer perception, making any negative interaction a potential reputational threat.

132.    According to its May 21, 2020 prospectus, "Ferrari is among the world's leading luxury brands focused on the design, engineering, production and sale of the world's most recognizable luxury performance sports cars. The Ferrari brand symbolizes exclusivity, innovation, state-of-the-art sporting performance, and Italian design and engineering heritage." Moreover, "[w]hilst broadening its product portfolio to target a larger customer base, the Group continues to pursue a low volume production strategy in order to maintain a reputation of exclusivity and scarcity among purchasers of its cars and carefully manages its production volumes and delivery waiting lists to promote this reputation."[68] The "Ferrari" brand, therefore, also leads to significant revenues for Ferrari SpA through merchandise and exclusivity.

133.    Ferrari engages in extensive litigation in order to protect its brand. For example, Ferrari requires consent prior to using its trademark and will litigate unauthorized uses of its trademark in fashion shows or on social media.[69] Ferrari also maintains a "list" of exclusive models to be sold only to those who respect the Ferrari brand.[70]

134.    Ferrari also applies this aggressive approach in dealing with reputational threats to

---

[68]    *May 21, 2020 Prospectus*, FERRARI N.V., available at https://corporate.ferrari.com/sites/ferrari15ipo/files/drs_-_ferrari_n.v._-_prospectus_21_may_2020_final_approved_by_cbi_5.pdf.

[69]    *See e.g.*, Totino, Serena, *Don't Mess with Ferrari: The Prancing Horse Legal Drama*, NATIONAL LAW REVIEW (Nov. 6, 2020), available at: https://www.natlawreview.com/article/don-t-mess-ferrari-prancing-horse-legal-drama

[70]    In a statement concerning Ferrari's decision to "blacklist" certain celebrities, Ferrari stated it "reserves the right to decide on special editions." *See Ferrari responds if it banned Justin Bieber and the Kardashians from buying its cars*, MARCA (May 2022) https://www.marca.com/en/lifestyle/celebrities/2022/05/17/6283c08ce2704e70438b457e.html.

investigate mechanical and ethical faults. Per the Ferrari "Code of Conduct," "[u]nder no circumstances should you independently investigate suspected or known violations of the Code."[71] All investigations are to be conducted via an internal audit by Ferrari's legal team.[72] This process is reportedly done to protect the company first and foremost.

135.    To put this "Code of Conduct" into context, if a technician found a defect with a car part, they would need to take the matter to a superior before searching for a solution.[73]

136.    The strategy of aggressive brand protection comes at a loss to consumer safety, with service technicians encouraged to quietly resolve issues without submitting warranty claims. Here, despite the Defendants' knowledge of the Brake Defect, ultimately, Ferrari chose to conceal the true nature of the Brake Defect from Plaintiff and the Class.

### D.    FERRARI WAS LEGALLY REQUIRED TO DISCLOSE THE BRAKE DEFECT AS A KNOWN SAFETY DEFECT AND FAILED TO DO SO

137.    Ferrari and Bosch knew of the Brake Defect but did not disclose it to purchasers or lessees either before or after their transaction. Had Ferrari or Bosch disclosed the Brake Defect, Plaintiff and Class members could have incorporated the information in their purchase/lease decision.

138.    Ferrari and Bosch could have, and should have, disclosed the Brake Defect in their various communications at the point of sale but, instead, failed to do so.

139.    Ferrari concealed material facts of intrinsic qualities, *i.e.*, that the brakes were defective, that Plaintiff and the Class could not discover by the exercise of ordinary care.

---

[71]  Ace Macneill, *10 Rules Every Ferrari Employee Has To Follow* (HOTCARS 2020) https://www.hotcars.com/ferrari-employee-rules/ (last accessed Dec. 5, 2022).

[72] *Id.*

[73] *Id.*

140.     Each Defendant has engaged in partial disclosures concerning the Recalls, so there exists a duty to disclose the root cause of the Brake Defect. As described herein, the Cap and Warning Repair fails to remedy the Brake Defect.

141.     To this day, Defendants continue to omit material information concerning the Brake Defect in the Class Vehicles from users, consumers, and the public. As a result, consumers continue to operate Class Vehicles and continue to experience dangerous failures of the defective braking system and are at an apparent increased risk for crashes and bodily harm.

**E.     PLAINTIFF AND CLASS MEMBERS WOULD NOT HAVE PURCHASED, THE CLASS VEHICLES HAD THEY KNOWN OF THE BRAKE DEFECT**

142.     No owner or lessee of a Class Vehicle would have purchased their vehicle had they known that the braking system might suddenly and unexpectedly partially or totally lose braking capability or had they known that Ferrari and Bosch would fail to fix a known defect in the master cylinder/brake booster assembly.

143.     As a result of the Brake Defect in Class Vehicles and the costs of repairs required to ameliorate it, Plaintiff and all owners of Class Vehicles have suffered injury, in fact, incurred damages, and have suffered harm as a result of both Ferrari's and Bosch's acts and omissions. Plaintiff and Class members seek, among other things, remedies under the consumer protection statutes of the states in which they reside and/or purchased their Class Vehicles, and also seek recovery for Ferrari's breach of express warranty, breach of implied warranty, and fraudulent concealment.

144.     Plaintiff and each Class member suffered injury as they purchased their Class Vehicle under the express and implied warranties that their vehicles would operate safely throughout the useful life of such vehicles. A vehicle containing a Brake Defect does not operate as warranted and for its intended purpose because it does not operate safely or reliably.

**F.     FERRARI HAS MANIPULATED ITS WARRANTY TO MINIMIZE ITS OBLIGATION TO FIX THE BRAKE DEFECT IN THE CLASS VEHICLES**

145.    In connection with the sale of new vehicles, including the Class Vehicles, Ferrari provides a warranty for the lesser of three years or 36,000 miles.

146.    The warranty states:

Every new Ferrari has a three-year/unlimited-mileage warranty and a seven-year free maintenance program from the date of purchase. The three-year warranty can be extended by two years with bumper-to-bumper coverage.

147.    In connection with the sale of certified pre-owned vheicles, including the Class Vehicles, Ferrari provides a warranty which states:

A Ferrari Approved vehicle includes a minimum of 12 months coverage.

The exterior paintwork and interior trim are restored to a condition appropriate to the vehicle's age and mileage, and the car also receives a full and thorough detailing by using only the finest quality materials.

The vehicle document folder is checked to ensure that all the correct documents are present and complete. The end result is a car prepared to Ferrari standards that wears the Prancing Horse with pride.

Excluded are parts including wear items such as tires, brake pads and disks, or parts, which have to be exchanged due to normal wear.

148.    In order to obtain repairs under warranty, owners and lessees of covered vehicles are told by Ferrari to present their vehicles to Ferrari-authorized repair centers and retailers.

149.    Ferrari is not honoring the plain language of its warranty agreement. As described above, the Cap and Warning does not remedy the root cause of the Brake Defect. Even when owners of the Class Vehicles have presented their cars to Ferrari service centers and complained of issues traceable to the Brake Defect, Ferrari has (1) failed to remedy the Brake Defect and/or (2) failed to have adequate parts available for the Cap and Warning. Ferrari's failure to remedy the Brake Defect constitutes a breach of its warranty agreement.

G. **ALLEGATIONS ESTABLISHING AGENCY RELATIONSHIP BETWEEN FERRARI NA AND FERRARI DEALERSHIPS IN THE UNITED STATES**

150. Ferrari maintains programs to train its employees and police its consumer base in order to ensure that Ferrari's reputation for automotive excellence and luxury remains unblemished. This reputation is invaluable for Ferrari. Plaintiff and members of the Class relied on that reputation, which Ferrari cultivates, when determining to purchase their Class Vehicles. Plaintiff and members of the Class reasonably expected to receive a Class Vehicle free of a dangerous safety defect in their braking assemblies.

151. Ferrari SpA has a uniform program in place to train its representatives to sell the Class Vehicles. The program is designed to maximize the sale of Ferrari vehicles and to minimize the disclosure of facts that may deter future owners.

152. For example, Ferrari SpA maintains a Service Advisor program in Europe, which is a comprehensive, 3-year program that provides all apprentices with the support they need to develop skills to become knowledgeable and expertly trained apprentices who will become the Ferrari Service Technicians of the future.

153. That position is designed as an introduction to Ferrari products, enhancing customer service skills and developing advanced selling skills. As part of the program, representatives undertake on-the-job training while earning an academic qualification.

Year 1: 7 Week Residential Training

| Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 |
|---|---|---|---|---|---|---|
| Welcome to Ferrari<br>Health & Safety<br>Brand<br>Introduction<br>EPR<br>Business Hierarchy | Ferrari Product Training<br>An overview of Ferrari product | Vehicle Inspection<br>Braking Systems<br>Servicing PDI, 190, MOT<br>Information Sourcing | Ferrari Genuine<br>The range<br>DAD<br>Social Media<br>Running a campaign<br>Using MODISO | Chassis Introduction<br>Steering, suspension<br>Geometry, Tyre changing<br>Pirelli Trip to Carlisle (2 days) | Customer Service Skills<br>Understand the customer<br>Presentation skills<br>CSI & FRI<br>Mystery Shop<br>Customer Journey<br>Advanced Oilnow | End of Year assessment<br>Gateway 1<br>2,000 word work based project<br>Professional discussion |

Year 2: 7 Week Residential Training

| Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 |
|---|---|---|---|---|---|---|
| Retention<br>Service Entry<br>OCP<br>Warranty & Service<br>Plan<br>Ferrari with you<br>Ferrari Approved | Service Culture<br>Brand<br>Customer delight<br>Handling objections<br>Effective communication<br>Competitor culture exercise | Parts & Accessory Management<br>Inventory management<br>Ferrari composite | Selling Accessories<br>Client understanding<br>Genuine Oilnow<br>OCP - managing opportunities to succeed<br>Product updates | Marketing<br>Segmentation<br>The P's of Marketing HPPS<br>Creating a marketing plan<br>Budgeting & ROI | Digital Marketing<br>Campaigns<br>Digital platforms<br>Optimisation<br>Marketing plan<br>Budgeting & ROI | End of Year assessment<br>Gateway 1<br>2,000 word assignment and work based project<br>Professional discussion |

Start an apprenticeship with Ferrari



APPLY NOW

154.     Upon information and belief, Ferrari NA also impliedly or expressly acknowledged that Ferrari-authorized dealerships are its sales agents, the dealers have accepted that undertaking, Ferrari NA can control authorized Ferrari dealers, and Ferrari NA acts as the principal in that relationship, as is shown by the following:

i.      Ferrari NA can terminate the relationship with its dealers at will;

ii.     The relationships are indefinite;

iii.    Ferrari NA is in the business of selling vehicles, as are its dealers;

iv.     Ferrari NA provides tools and resources for Ferrari dealers to sell vehicles;

v.      Ferrari NA supervises its dealers regularly;

vi.     Without Ferrari NA, the relevant Ferrari dealers would not exist;

vii.    Ferrari NA requires the following of its dealers:

a.      Reporting of sales;

b.      Computer network connection with Ferrari NA;

c.      Training of dealers' sales and technical personnel;

d.      Use of Ferrari NA-supplied computer software;

    e.      Participation in Ferrari NA's training programs;

    f.      Establishment and maintenance of service departments in Ferrari dealerships;

    g.      Certify Ferrari pre-owned vehicles;

    h.      Reporting to Ferrari NA with respect to the vehicle delivery, including reporting Class members' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VINs, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

    i.      Displaying Ferrari NA logos on signs, literature, products, and brochures within Ferrari dealerships.

viii.    Dealerships bind Ferrari NA with respect to:

    a.      Warranty repairs on the vehicles the dealers sell and

    b.      Issuing service contracts administered by Ferrari NA.

ix.    Ferrari NA further exercises control over its dealers with respect to:

    a.      Financial incentives given to Ferrari dealer employees;

    b.      Locations of dealers;

    c.      Testing and certification of dealership personnel to ensure compliance with Ferrari NA's policies and procedures; and

    d.      Customer satisfaction surveys, pursuant to which Ferrari NA allocates the number of Ferrari cars to each dealer, thereby directly controlling dealership profits.

x.      Ferrari dealers sell Ferrari vehicles on Ferrari NA's behalf.

xi.     Dealerships bear Ferrari's brand names, use Ferrari's logos in advertising and on warranty repair orders, post Ferrari-brand signs for the public to see, and enjoy a franchise to sell Ferrari NA's products, including the Class Vehicles.

xii.    Ferrari NA requires Ferrari dealers to follow the rules and policies of Ferrari NA in conducting all aspects of dealer business, including the delivery of Ferrari NA's warranties described above and the servicing of defective vehicles such as the Class Vehicles.

xiii.   Ferrari NA requires its dealers to post Ferrari's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Ferrari dealers and servicing outlets for Ferrari NA cars.

xiv.    Ferrari NA requires its dealers to use service and repair forms containing Ferrari NA's brand names and logos.

xv.     Ferrari NA requires Ferrari dealers to perform Ferrari NA's warranty diagnoses and repairs and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Ferrari NA.

xvi.    Ferrari NA requires Ferrari dealers to use parts and tools either provided by Ferrari NA or approved by Ferrari NA and to inform Ferrari when dealers discover that unauthorized parts have been installed on one of Ferrari NA's vehicles.

xvii.   Ferrari NA requires dealers' service and repair employees to be trained by Ferrari in the methods of repair for Ferrari-brand vehicles.

xviii.  Ferrari NA audits Ferrari dealerships' sales and service departments and directly

contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix. Ferrari NA requires its dealers to provide Ferrari with monthly statements and records pertaining, in part, to dealers' sales and servicing of Ferrari NA's vehicles.

xx. Ferrari NA provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines and repair procedures to be followed for chronic defects.

xxi. Ferrari NA provides its dealers with specially trained service and repair consultants, with whom Ferrari NA requires dealers to consult when dealers are unable to correct a vehicle defect on their own.

xxii. Ferrari NA requires Ferrari-brand vehicle owners to go to authorized Ferrari dealers to obtain servicing under Ferrari warranties.

xxiii. Ferrari dealers are required to notify Ferrari NA whenever a car is sold or put into warranty service.

## V. DEFENDANTS MADE MISLEADING STATEMENTS ABOUT CLASS VEHICLE SAFETY AND BRAKING CAPABILITY.

### A. EACH CLASS VEHICLE HAS SEVERAL "IN-VEHICLE" SAFETY LABELS THAT MISLEADINGLY ASSURED CONSUMERS THAT THE CLASS VEHICLES CONTAINED A BRAKING SYSTEM THAT FUNCTIONED PROPERLY.

155. Defendants know and have known, that a properly functioning braking system and vehicle safety, in general, are essential attributes to consumers in deciding to purchase or lease a vehicle. These attributes are especially true for the Class Vehicles, which are symbols of status, investments by collectors, and expected to be tested in rigorous driving conditions. This collective understanding informed Ferrari SpA's marketing strategy for and representations to consumers

68

about the Class Vehicles, as reflected throughout the informational labels and representations included in every Class Vehicle.

156.    As described in detail below, these safety representations include window stickers affixed to each Class Vehicle at the point of sale or lease and made available online; certification labels that uniformly communicate compliance with motor vehicle safety standards in every Class Vehicle; and in-vehicle safety information, such as in the Warranty Card and Owner's Service Book, about brakes and required maintenance of the braking system. Overall, these window stickers, safety labels, and information uniformly and misleadingly communicated to consumers before they decided to purchase or lease a Class Vehicle that the Class Vehicles were safe and had a properly functioning braking system when, in fact, they did not.

**1.    Ferrari NA distributed Class Vehicles with Monroney labels that had misleading assurances regarding safety.**

157.    In the United States, automobile dealers must sell or lease vehicles with window stickers that provide essential information about a vehicle's features, including its safety features and performance characteristics. *See* 15 U.S. Code § 1232. These window stickers are commonly called "Monroney labels."

158.    Every Class Vehicle had a Monroney label affixed to it at the point of its original sale or lease at a dealership. The labels are large—approximately the size of a standard sheet of paper—and prominently displayed on the vehicles, typically taped to a window.

159.    Monroney labels are also essential resources for used vehicle purchasers because they can also be affixed to used cars at the point of sale, and they are readily available online, including at https://monroneylabels.com. Upon information and belief, used car dealers often provide printed Monroney labels to consumers when offering the vehicles for sale or lease. Given this standard practice, Monroney labels informed the sale or lease of used Class Vehicles as well.

160.    Although dealers displayed the Class Vehicles with Monroney labels prior to sale and lease, they did not author the labels and had no control over or input in the contents of the Monroney labels. Instead, Ferrari NA controls the contents of the Monroney labels for his Class Vehicle. Specifically, Ferrari NA was responsible for drafting and approving the content of the Monroney labels for all Class Vehicles. On the Monroney label for each Class Vehicle, the name and address of Ferrari NA is listed as follows: "Ferrari North America, Inc. 250 Sylvan Avenue Englewood Cliffs, NJ 07632".

161.    Nor did the dealers themselves affix the labels to Class Vehicles. Instead, Ferrari NA affixed the Monroney labels to their respective Class Vehicles before shipping them across the United States to the dealers. Specifically, Ferrari NA affixed Monroney labels to all Class Vehicles prior to shipping them to dealers.

162.    When Ferrari NA shipped Class Vehicles with Monroney labels to dealers, it knew that U.S. law prohibited automobile dealers from removing the Monroney labels from the Class Vehicles, and that only consumers are allowed to remove the labels. Specifically, Ferrari NA statutorily added the warning notice as follows: "[t]his label has been affixed to this vehicle pursuant to the requirements of 15 U.S.C. § 1231 *et seq.*, which prohibits its removal or alteration prior to delivery to the ultimate purchaser."

163.    The dealerships were prohibited from removing the Monroney labels from the Class Vehicles because it was Plaintiff and members of the Class who were the direct or "ultimate" purchasers of the Class Vehicles.

164.    Upon information and belief, Ferrari NA tells automobile dealers to display Class Vehicles with Monroney labels that it approves.

165.     Upon information and belief, this instruction is part of written policies or contracts that Ferrari NA provides to the authorized dealers who sell or lease their respective vehicle models. Although no law required them to do so, Ferrari NA voluntarily chose to include information about the braking capability on all Monroney labels for Class Vehicles, typically under a heading for "SAFETY" or "STANDARD EQUIPMENT INCLUDED IN SUGGESTED RETAIL PRICE" Representative examples are detailed below:

(a)     On the Monroney labels for Plaintiff's and some Class Members' Class Vehicles, under STANDARD EQUIPMENT INCLUDED IN SUGGESTED RETAIL PRICE, the "CCMD-CARBON CERAMIC BRAKES" are featured, which are more expensive than traditional brakes and made to withstand extreme temperatures from high-performance demands of a racetrack; and

(b)     On the Monroney label for Plaintiff's and some Class Members' Class Vehicles, under STANDARD EQUIPMENT INCLUDED IN SUGGESTED RETAIL PRICE, the "SSC (SLIDE SLIP ANGLE CONTROL)" is featured, which is a feature that predicts how much brake pressure is need for each wheel.[74]

---

[74] Ferrari SpA also advertises this feature in its U.S. magazine and on its website. *See* Jason Barlow, *Great Ferrari Innovations: The E-diff and side slip control* Ferrari (Mar. 1, 2022) https://www.ferrari.com/en-US/magazine/fr-SN/articles/great-ferrari-innovations-the-e-diff-and-slide-slip-control?amp=true ("The 488 GTB, F12tdf and 488 Pista all use evolved versions of Side Slip Control. The Pista also added another tool: the Ferrari Dynamic Enhancer, which brings the brakes into play. This system predicts a moment of yaw based on the SSC's algorithms and works with the dynamics ECU to determine how much brake pressure is needed at each wheel. It's complex stuff, no question[…].").

166.    These descriptions of components of the braking systems in the Class Vehicles on Monroney labels were misleading to Plaintiff and Class Members because they conveyed to any reasonable consumer that the Class Vehicles had a properly functioning, indeed a high-performance, braking system that would engage during all vehicle braking events during ordinary driving, when, in fact, the Class Vehicles have defective braking systems that can partially or totally lose braking capability due to the leakage of brake fluid.

167.    Upon information and belief, Ferrari NA chose to include misleading descriptions of the braking systems on their Monroney labels because it wanted to encourage Class Members to purchase or lease the Class Vehicles and knew that braking capability and vehicle safety are critically important to consumers when deciding to purchase or lease a vehicle, especially in vehicles advertised as high-performance, luxury, and racetrack-ready.

168.    All Defendants knew that dealers sold or leased Class Vehicles with Monroney labels with these kinds of misrepresentations about the braking systems and vehicle safety because every significant participant in the automotive industry is familiar with the standard practice of including this type of information on Monroney labels.

169.    As a sophisticated and well-funded corporate entity that derives billions of dollars in revenue from the sale and distribution of its vehicles to U.S.-based dealerships, Ferrari SpA was explicitly aware that Ferrari NA distributed the Class Vehicles with Monroney labels that included information about the braking systems and safety features in the Class Vehicles.

170.    As a sophisticated and well-funded corporate entity that generates billions of dollars in annual revenue from work in the U.S. automotive industry, Bosch GmbH was explicitly aware that Ferrari SpA distributed Class Vehicles with Monroney labels that included information about braking systems and safety features.

171.    As the above examples make clear, the Monroney labels for the Class Vehicles uniformly and wrongly assured Plaintiff and Class members that the Class Vehicles were safe and would meet or exceed ordinary braking performance. The statements and information on the labels suggested to any reasonable consumer that the Master Cylinder / Brake Booster Assembly did not suffer from a defect and would perform its intended function of bringing the Class Vehicles to a complete stop in compliance with FMVSS 105 and 135. This was false and misleading because the braking systems installed in the Class Vehicles were, in fact, defective and posed an unreasonable risk to the safety of vehicle occupants. Had Defendants disclosed the defective nature of the braking systems or that brake fluid may leak, resulting in partial or total loss of braking capability, on the Monroney labels of the Class Vehicles, Plaintiff would have seen such a disclosure.

        **2.    Ferrari SpA affixed  misleading safety certification labels to the Class Vehicles.**

172.    To sell the Class Vehicles in the United States, Ferrari SpA certified "that the vehicle or equipment complies with applicable motor vehicle safety standards prescribed." 49 U.S.C. § 30115. Vehicle manufacturers make this representation through a label "permanently fixed to the vehicle[s]" that they make, sell and/or distribute. They "may not issue the certificate if, in exercising reasonable care," they have "reason to know the certificate is false or misleading in a material respect." 49 U.S.C. § 30115; *see also* 49 U.S.C. § 30112.

173.    Because the Class Vehicles could not have been lawfully sold or leased without it, all Class Vehicles have a permanent label that certifies compliance with the safety regulations prescribed by NHTSA under Chapter 301. As passenger vehicles, the permanent label on each Class Vehicle must state: "This vehicle conforms to all applicable Federal motor vehicle safety,

bumper, and theft prevention standards in effect on the date of manufacture shown above." 49 CFR § 567.4(g)(5).

174.    As described further below, the false and misleading certification labels in the Class Vehicles were drafted and placed—or directly approved for placement—in all Class Vehicles by Ferrari SpA in Italy. Without Ferrari SpA placing or approving the misleading certifications in the Class Vehicles, Plaintiff and Class members could not have purchased or leased them. The certification expressly identified Ferrari SpA as the certifying manufacturer, as demonstrated by the below picture of the certification from Plaintiff's Class Vehicle made in Italy.



175.    Upon information and belief, all major participants in the automotive industry know that automobile manufacturers include certifications of compliance with federal safety standards in every vehicle sold or leased in the United States because the inclusion of such certifications is standard practice in the industry.

176.    As a sophisticated and well-funded corporate entity whose primary activities focused on the importation, distribution, and sale of vehicles in the U.S., Ferrari NA and Bosch

GmbH knew that Ferrari SpA placed permanent labels certifying conformance to safety standards on U.S.-bound Class Vehicles.

177.    These certification labels on the Class Vehicles were misleading because they indicated to any reasonable consumer that the braking system would perform its intended function during braking and did not suffer from a defect nor subject the vehicles to multiple points of failure. See 49 CFR §§ 571.105, 571.135 (Federal motor vehicle safety standards requiring, among other things, that a "master cylinder shall have a reservoir compartment for each service brake subsystem serviced by the master cylinder. Loss of fluid from one compartment shall not result in a complete loss of brake fluid from another compartment."). This was not true because of the defective Master Cylinder / Brake Booster Assembly and the risk of brake fluid leaking from multiple points of failure, resulting in the partial or total loss of braking capability.

### 3.    Ferrari NA provided misleading in-vehicle safety information, such as in the Warranty Card and Owner's Service Book, about brakes and required maintenance of the braking system.

178.    Ferrari NA also sold the Class Vehicles with an accompanying Warranty Card and Owner's Service Book ("Owner's Manual"). The Owner's Manual contained several misleading statements and/or omissions concerning the braking systems, maintenance of the braking systems, and that the braking systems were free from defects.

179.    For illustrative purposes, in the accompanying Owner's Manual for purchasers and lessees of the Class Vehicles is that:

> Ferrari warrants to the original purchaser and each subsequent purchaser that the vehicle is designed, built and equipped so as  to conform at the time of sale with all U.S.A. emission standards applicable at the time of manufacture and that it is free from defects in materials and workmanship which would cause it not to meet these standards within the period of 2 years or 24,000 miles, whichever occurs first.

Accordingly, Ferrari NA expressly warranted the warranty extended to each Class Vehicle and that at the time of sale, the vehicle was free from defects.

180.    Another example is the Maintenance Schedule section of the Owner's Manual, which states that "[t]he brake fluid reservoir should be checked every 15,000 miles. Fluid should be replaced at least every 12 months." Yet the Owner's Manual completely omits any information about the danger of leaking brake fluid or that in the event of leaking brake fluid, the vehicles may partially or totally lose all braking capability.

**B.      FERRARI NA IMPORTED VEHICLES INTO THE UNITED STATES AND WARRANTED THE VEHICLES COMPLIED WITH FEDERAL MOTOR VEHICLE SAFETY STANDARDS.**

181.    To sell the Class Vehicles in the United States, Ferrari NA had to comply with the U.S. Customs and Border Protection ("CBP") when importing the Class Vehicles into the United States from Italy. Ferrari NA and/or agents acting on its behalf, as an Importer of Motor Vehicles, were required to submit a Form HS-7 at the time the vehicle was imported to declare whether the vehicle complies with Department of Transportation requirements. As a general rule, motor vehicles less than 25 years old must comply with all applicable FMVSS standards in order to be imported permanently into the United States. As stated above, vehicles manufactured to meet the FMVSS will have a certification label affixed by the original vehicle manufacturer in the area of the driver-side door.

182.    When importing the Class Vehicles, Ferrari NA and/or agents acting on its behalf did submit a Form HS-7, a Declaration of Importation of Motor Vehicles and Motor Vehicle Equipment Subject to Federal Motor Vehicle Safety, Bumper and Theft Prevention Standards, for each Class Vehicle. Ferrari NA and/or agents acting on its behalf were required to declare as follows:

> The vehicle or equipment item conforms to all applicable Federal Motor Vehicle Safety Standards (or the vehicle does not conform solely because readily attachable equipment items that will be attached to it before it is offered for sale to the first purchaser for purposes other than resale are not attached), and Bumper and Theft Prevention Standards, and bears a certification label or tag to that effect

76

permanently affixed by the original manufacturer to the vehicle or affixed by the manufacturer to the equipment item or to its delivery container in accordance with applicable National Highway Traffic Safety Administration (NHTSA) regulations. [591.5(b)]

183.    The declarant making the declaration was subject to the requirement that "knowingly making a false declaration is subject to a fine of not more than $10,000 or imprisonment for not more than 5 years or both (18 U.S.C. 1001)."

184.    When importing the Class Vehicles, Ferrari NA and/or agents acting on its behalf were also required to identify, among other things, the Port of Entry, Customs Port Code, Customers Entry Number, Entry Date, and VIN Number.

185.    Upon information and belief, all major participants in the automotive industry know that automobile manufacturers include certifications of compliance with federal safety standards in every vehicle sold or leased in the United States because the inclusion of such certifications is standard practice in the industry.

186.    As sophisticated and well-funded corporate entities whose primary activities focused on the importation, distribution, and sale of vehicles in the U.S., Ferrari SpA and Bosch GmbH knew that Ferrari NA was required to certify that each Class Vehicle complied with FMVSS.

187.    The Form HS-7 submitted for each of the Class Vehicles was false because the Class Vehicle violated FMVSS requirements. See 49 CFR §§ 571.105, 571.135 (Federal motor vehicle safety standards requiring, among other things, that a "master cylinder shall have a reservoir compartment for each service brake subsystem serviced by the master cylinder. Loss of fluid from one compartment shall not result in a complete loss of brake fluid from another compartment."). This was not true because of the defective Master Cylinder / Brake Booster

Assembly and the risk of brake fluid leaking, resulting in the partial or total loss of braking capability.

### C.   FERRARI SPA AND FERRARI NA ALSO MADE FALSE AND MISLEADING STATEMENTS ABOUT THE CLASS VEHICLES' SAFETY IN THEIR CONSUMER-FACING MARKETING.

188.    Ferrari SpA and Ferrari NA also touted the Class Vehicles and the brake systems as safe in national advertising directed at consumers through multiple marketing channels. These advertisements (*see* below) uniformly indicated to any reasonable consumer that the Class Vehicles were safe and had braking systems that would function properly and reliably in ordinary and strenuous circumstances. These representations about the Class Vehicles were false and misleading because of the Brake Defect in the Class Vehicles and the risks of losing braking capability due to that defect.

189.    As a sophisticated and well-funded corporate entity that generates billions of dollars in annual revenue from work in the automotive industry Bosch GmbH was aware that Ferrari SpA and Ferrari NA advertised the safety of the Class Vehicles to consumers, including the braking system.

190.    Ferrari SpA and Ferrari NA could have disclosed the Brake Defect and informed Plaintiff and the Class about the safety hazard posed by the Brake Defect, whether through its agents (certified Ferrari dealerships subject to its Dealer Agreements, such as Plaintiff's dealership), through various communications available at the point of sale, or other means available.

191.    Yet in the numerous materials provided to Plaintiff and members of the Class, Ferrari SpA and Ferrari NA ultimately failed to inform them of the Defect. Several illustrative examples are listed below of advertisement brochures created by Ferrari SpA and distributed to Ferrari NA for sales and marketing purposes:

The 458 Italia offers even more efficient braking than the 8-cylinders that preceded it, delivering absolutely outstanding stopping distances (100-0 km/h in 32.5 metres; 200-0 Km/h in 128 metres).

These values are the combined the **development and optimisation of braking system control logics in collaboration with Bosch®** to enhance grip and help the ECU to prevent the wheels from locking and the car from skidding…

*See* Ferrari 458 Italia Brochure, available at: https://www.auto-brochures.com/ferrari.html (created on Sep. 20, 2010) (emphasis added).

To cope with the demands of the car's increased performance, all of the components in the Brembo braking system have been evolved from the solutions introduced on the LaFerrari. The 458 Speciale sports Extreme Design calipers, new generation HT2 discs with a higher percentage of silicon, and smaller front pads made from HY hybrid material for improved heat dissipation which is also boosted by special channels in the bodywork and is crucial in extreme driving situations. The result is shorter stopping distances (100 – 0 km/h in 31 m) without any compromises in weight, and more consistent performance under severe use.

*See* Ferrari 458 Speciale Brochure, available at: https://www.auto-brochures.com/ferrari.html (created on Nov. 29, 2013).

The 458 Spider also delivers **absolutely outstanding braking distances** (100-0 km/h in 32.8 metres; 200-0 km/h in 128.5). These superb figures come as a result of the **development and optimisation of control logics and systems in collaboration with Bosch**, the evolution of the Ferrari Pre-Fill logic to minimise response times, specific ABS calibration for medium-high grip situations, and the integration of E-DIFF3 and ABS control logics to guarantee both more precise vehicle speed estimation in braking under ABS, resulting in better control of braking torque, and greater stability. **The 458 Spider's tyres were also specially developed with a particular focus on grip to bring them in line its superb braking system.**

*See* Ferrari 458 Spider Brochure, available at: https://www.auto-brochures.com/ferrari.html (created on Dec. 8, 2011) (emphasis added).

**The 612 Scaglietti's braking system is particularly responsive and efficient**, thanks to the fact that it uses CCM (Carbon Ceramic Material) brake discs originally developed for use in Formula 1. Of course, Ferrari is the first and only constructor in the world to offer this system on its entire range. **The 612 Scaglietti's brakes are also highly resistant to fading and thus exceptionally effective in high-stress driving situations.**

*See* Ferrari 612 Scaglietti Brochure, available at: https://www.auto-brochures.com/ferrari.html (created on Mar. 1, 2008) (emphasis added).

79

**[B]y its effectiveness and its reliability, even under the most extreme driving conditions**. Like all of the latest generation Ferraris, the Ferrari California is equipped with CCM (Carbon Ceramic Material) disks. Originally launched on the Enzo Ferrari supercar in 2002 and subsequently adopted on the Challenge Stradale, Ferrari has built up years of experience in this technology, accumulating know-how unique among sports car manufacturers. CCM brakes guarantee higher vehicle performances, as they have shorter response times and better performance consistency when the vehicle is used intensively. The disks are larger in diameter, with specific brake pads, which allows for higher thermal distribution and fatigue resistance, thus practically eliminating the phenomenon of fading. The brakes have a longer life and therefore lower running costs. Compared to a traditional system, the weight of the vehicle is reduced around 15 kg, mainly affecting the unsuspended weight of the vehicle, with as a result both improved handling and travelling comfort.

*See* Ferrari California Brochure, available at: https://www.auto-brochures.com/ferrari.html (created on Sep. 17, 2010) (emphasis added).

This technology has already been successfully employed on its road cars, starting with the Enzo Ferrari. The carbon ceramic discs are different diameters front and rear - 380 x 34 mm at the front with 6-pot callipers, and 350 x 34 mm at the rear with 4-pot callipers. **Pedal travel is constant even under repeated braking, and fade has been eliminated even under hard track use.**

*See* Ferrari F430 Brochure, available at: https://www.auto-brochures.com/ferrari.html (created on Nov. 7, 2005) (emphasis added).

192.    Defendants had a duty to disclose the Brake Defect because they touted the Class Vehicles' purported superior braking capabilities. This was a materially misleading partial disclosure that created a duty for Defendants to disclose the inherent risk associated with the defective braking systems.

193.    Because Ferrari and Bosch did not warn Plaintiff or Class members of the Brake Defect, Plaintiff and Class members purchased and/or leased their Class Vehicle unaware of the Brake Defect.

194.    If Plaintiff and Class Members had known of the Brake Defect, they would not have purchased their Class Vehicle. In addition, because of the Defendants' exclusive and superior

knowledge of the Brake Defect, customers necessarily could not have discovered the Brake Defect by the exercise of reasonable care. Accordingly, Ferrari had a duty to disclose the existence of the Brake Defect from at least as early as the fatal crash in Hong Kong.

## VI.    FRAUDULENT OMISSION ALLEGATIONS

195.    Absent discovery, Plaintiff is unaware of and unable, through reasonable investigation, to obtain the proper names and identities of those individuals at Ferrari and Bosch responsible for disseminating unfair, deceptive, and misleading marketing materials regarding the Class Vehicles. Defendants are necessarily in possession of all this information. Plaintiff's claims arise out of, among other things, Defendants' fraudulent omission of the Brake Defect.

196.    Plaintiff alleges that at all relevant times, including specifically at the time he and Class members purchased their Class Vehicles, Ferrari and Bosch knew, should have known, or were reckless in not knowing of the Brake Defect; Ferrari and Bosch had a duty disclose information material to a consumer, such as the Brake Defect, based upon their exclusive knowledge especially concerning a safety defect; but Ferrari and Bosch never disclosed the Brake Defect to Plaintiff, Class members, or the general public other than their inadequate recall of the Class Vehicles which fails to remedy the Brake Defect.

197.    Plaintiff makes the following allegations as specific as reasonably possible:

(a)    **Who:** Ferrari NA, Ferrari SpA, Bosch GmbH, and Bosch LLC as the agent/alter ego of Bosch GmbH, actively omitted the Brake Defect from Plaintiff and Class Members at all relevant times, up to and including at the point of sale. Defendants' agents should have and could have disclosed the Brake Defect due to their superior knowledge of the Brake Defect, which was exclusively in the control of Defendants prior to the Plaintiff and Class

Members taking possession of their vehicles. As to Plaintiff himself, Ferrari and its authorized dealerships should have and could have disclosed the Brake Defect at the time of purchase or after that. The superior and exclusive knowledge of the manufacturers, especially for a sophisticated, high-end vehicle like a Ferrari, required the disclosure of important information about the safety and performance of the vehicle, as such information is uniquely within the control of the manufacturer and its agents and cannot be discovered until after purchase by the consumer. Defendants and their agents further had a duty to disclose the Brake Defect because they made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations.

(b)     **What:** Ferrari and Bosch knew, should have known, or were reckless in not knowing that the Class Vehicles contained the Brake Defect despite their knowledge of the Brake Defect, which poses a safety threat to Plaintiff, Class Members, and the public and substantially affects the value and desirability of the Class Vehicles, Ferrari and Bosch failed to disclose the Brake Defect at the point of sale or after that and Ferrari made affirmative statements regarding the safety and braking performance of the Class Vehicles.

(c)     **When:** Defendants' omissions began from the start of the Class Period (defined below) and continue to this day. Ferrari and Bosch have backpedaled following their initial disclosure that the Brake Defect

concerns the braking assemblies manufactured by Bosch—instead attributing the loss of braking capability to a cap. As to Plaintiff himself, Defendants have continually omitted the true nature of the Brake Defect for the entirety of the relevant time period, including at the point of sale.

(d) **Where:** Ferrari and Bosch's omissions occurred in every communication they had with Plaintiff, Class members, and the general public. In fact, Ferrari and Bosch's omissions continue to this day. As to Plaintiff himself, Defendants' omissions occurred in every communication, including all communications that happened before, at the point of, and after they purchased a Class Vehicle.

(e) **How:** Ferrari and Bosch omitted and failed to disclose the Brake Defect to Plaintiff, Class members, or the general public at the point of sale or thereafter via a press release, permanent warnings affixed to the vehicles, direct mail campaign, or otherwise. As to Plaintiff himself, Ferrari and Bosch omitted and failed to disclose the Brake Defect on the Monroney Sticker, iPacket information packet, Certification Label, and accompanying vehicle documents or any other communication or point of sale document.

(f) **Why:** Ferrari omitted the Brake Defect in order to deceive Plaintiff, Class Members, and the general public into buying Class Vehicles for a premium value to maximize their profits and to avoid the significant expense of making the Class whole through fulsome damages. Furthering their goal to maximize profits, Ferrari and Bosch failed to notify Class members of the

true nature of the Brake Defect to avoid expensive warranty claims and expenses related to replacing every brake system in every Class Vehicle.

(g) **Causation:** Because Ferrari nor Bosch never disclosed the Brake Defect, despite their extensive knowledge, Plaintiff and Class members purchased or leased Class Vehicles that did not or will not safely brake and, as such, are worth less than one that does safely brake. Had Ferrari disclosed the Brake Defect, Plaintiff and other Class members would not have purchased or leased their Class Vehicle. Ferrari's omissions further devalue the Plaintiff's and Class Members' Class Vehicle and cause them to pay out-of-pocket for a complete fix for the Brake Defect.

## VII.   TOLLING OF STATUTES OF LIMITATIONS

198.   Defendants were and remain under a continuing duty to disclose to Plaintiff and members of the Class the true character, quality, and nature of the Class Vehicles, that the Brake Defect is based on a poor design and/or substandard materials, and that the Brake Defect will require costly repairs by Bosch GmbH and Ferrari NA, poses a safety concern, and diminishes the resale value of the Class Vehicles.

199.   As a result of this active concealment by Defendants, any applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

### A.   DISCOVERY RULE TOLLING

200.   Class Members had no way of knowing about the Brake Defect and the other information concealed by Defendants.

201.   Within the time period of any applicable statutes of limitation, Plaintiff and the Class Members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Brake Defect.

202.     Plaintiff and the Class did not discover and did not know of facts that would have caused a reasonable person to suspect that Ferrari NA and Bosch GmbH, through its agent/alter ego Bosch LLC, did not report information within their knowledge to federal authorities (including NHTSA), their dealerships, repairs centers, or consumers, nor would a reasonable and diligent investigation have disclosed that Defendants had information in their possession about the existence and dangerousness of the Brake Defect and opted to conceal that information until shortly before this action was filed.

203.     All applicable statutes of limitation have been tolled by operation of the discovery rule.

### B.     FRAUDULENT CONCEALMENT TOLLING

204.     All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

205.     Instead of disclosing the Brake Defect and disregard for the safety of which it was aware, Defendants falsely represented that Class Vehicles were safe, reliable, and of high quality and that they were a reputable manufacturer that stood behind the Class Vehicles that were on the road.

### C.     ESTOPPEL

206.     Defendants were under a continuous duty to disclose to Plaintiff and the other Class Members the true character, quality, and nature of the Brake Defect plaguing the Class Vehicles.

207.     Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Brake Defect from consumers.

208.     Defendants were also under a continuous duty to disclose to Plaintiff and the Class that numerous incidents involving the Brake Defect plagued the Class Vehicles and that the Brake

Defect systematically devalued the Class Vehicles and undermined safety.

209.   Based on the preceding, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VIII.   CLASS ACTION ALLEGATIONS

210.   The "Class Vehicles" are defined as follows: All Ferrari vehicles that are equipped with a braking system that may rupture and/or be subject to a leakage type of failure in any component of the service brake system, causing a partial or total loss of braking capability, including, but not limited to (1) vehicles containing the Defective Master Cylinder / Brake Booster Assembly; or (2) vehicles subject to the Cap and Warning Repair.[75]

211.   The "Class Period" is defined as from the initial production date of Class Vehicles containing the Brake Defect to the present.

212.   Plaintiff brings this action as a class action pursuant to Rule 23(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following Class:

### Florida Class

All persons or entities in the state of Florida who purchased or leased a Class Vehicle ("Class").

---

[75] The Class Vehicles recalled to date include those from NHTSA Recall Nos. 21V-833 and 22V-536, and include, but are not limited to, models: 2016-2019 Ferrari 488 Spider; 2019-2020 488 Pista Spider; 2010-2015 Ferrari 458 Italia; 2014-2015 Ferrari 458 Speciale; 2008-2009 Ferrari 430 Scuderia; 2005-2009 Ferrari 430 Spider; 2022 Ferrari 812 Competizione; 2005-2009 Ferrari 430; 2005-2011 Ferrari 612 Scaglietti; 2009-2017 Ferrari California; 2010-2011 Ferrari 612; 2012-2016 Ferrari FF; 2013-2017 Ferrari F12 Berlinetta; 2013-2015 Ferrari LaFerrari; 2015-2017 Ferrari California T; 2016 Ferrari F60 America; 2017 Ferrari F12 TDF; 2020-2022 Ferrari F8; 2016-2019 Ferrari 488 GTB; 2012-2015 Ferrari 458 Spider; 2015 Ferrari 458 Speciale Aperta; 2005-2009 Ferrari 430 Coupe; 2009 430 Scuderia Spider; 2005-2009 Ferrari 430 Spider; 2020-2022 Ferrari 812; 2018-2022 Ferrari 812 Superfast; 2020-2021 Ferrari 812 GTS; 2017 Ferrari LaFerrari Aperta; 2017-2020 Ferrari GTC4 Lusso; 2018-2020 Ferrari GTC4 Lusso T; 2019-2022 Ferrari Portofino; 2020-2022 Ferrari 812; 2019-2020 Ferrari 488 Pista; 2020-2022 Ferrari F8 Spider; 2020-2022 Ferrari F8 Tributo; and 2021-2022 Ferrari Roma.

Excluded from the Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Defendants, Defendants' dealers, Class Counsel and their employees, and the judicial officers and their immediate family members and associates court staff assigned to this case.

213.    <u>Numerosity—Fed. R. Civ. P. 23(a)(1)</u>. The Class is comprised of thousands of individuals who were Defendants' customers, the joinder of which in one action would be impracticable. The exact number or identification of the Class Members is presently unknown. The identity of the Class Members is ascertainable and can be determined based on Defendants' records. For example, many Class Members received a letter from Ferrari NA informing them of the Brake Defect, which was addressed to them, contained the VIN Number of their Class Vehicle, and was delivered to their home address. Ferrari SpA also, as recently as 2023, contacted Class Members directly to update each Class Member on the modification or update of Ferrari's privacy policies.

214.    <u>Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>. The questions of law and fact common to the Class predominate over questions affecting only individual Class Members and include, but are not limited to, the following:

(a)    Whether the Class Vehicles have the Brake Defect;

(b)    Whether the Defendants have engaged in unfair and/or deceptive trade practices by failing to disclose the material fact that the Class Vehicles have the Brake Defect;

(c)    Whether Defendants have engaged in unfair and/or deceptive trade practices by selling the Class Vehicles with a Brake Defect;

(d)    Whether Defendants knew or should have known about the Brake Defect in the Class Vehicles before making the Class Vehicles available for purchase and use by Plaintiff and the Class;

(e)    Whether Defendants owed a duty to Plaintiff and the Class to exercise

reasonable and ordinary care in the testing, design, production, manufacture, warranting, and marketing of the Class Vehicles;

(f)     Whether Defendants breached their duties to Plaintiff and the Class to exercise reasonable and ordinary care in the testing, design, production, manufacturer, warranting, and marketing of the Class Vehicles;

(g)     Whether Defendants breached their duties to Plaintiff and the Class by failing to promptly withdraw the Class Vehicles from the marketplace or take other appropriate remedial action;

(h)     Whether the Class Vehicles failed to perform in accordance with the reasonable expectations of ordinary consumers such as Plaintiff and the Class;

(i)     Whether Defendants' Class Vehicles fail to perform as advertised or warranted;

(j)     Whether Plaintiff and the Class are entitled to compensatory and/or actual damages, including but not limited to the cost to repair the Class Vehicles, remove and replace the defective brakes, as well as damages at the point of sale of the Class Vehicles;

(k)     Whether Defendants concealed material facts from their communications and disclosures to Plaintiff and the Class regarding the Brake Defect in the Class Vehicles;

(l)     Whether, as a result of Defendants' conduct, Plaintiff and the Class have suffered damages and, if so, the appropriate amount thereof; and

(m)    Whether Plaintiff and the Class are entitled to treble damages and/or punitive damages or other relief.

215.    Typicality—Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of the Class in that Plaintiff, like all Class Members, overpaid for a Class Vehicle containing the Brake Defect. Plaintiff and Class Members have experienced problems with their Class Vehicles or damages from purchasing their Class Vehicles consistent with those experienced by other Class Members. Plaintiff has suffered damages in the form of costs to replace and repair brake components in his Class Vehicle, as well as overpaying for his Class Vehicle at the point of sale, and such damages that are consistent with those suffered by Class Members.

216.   <u>Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)</u>. Plaintiff is an adequate representative of the Class because he fits within the class definition and his interests do not conflict with the interests of the members of the Class he seeks to represent. Plaintiff is represented by experienced Class Counsel. Class Counsel has litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the entire Class. Plaintiff and Class Counsel can fairly and adequately protect the interests of all  Members of the Class.

217.   <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>. A class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable, and individual litigation would be unduly burdensome to the courts. Plaintiff and members of the Class have suffered irreparable harm as a result of Defendants' bad faith, fraudulent, deceitful, unlawful, and unfair conduct. Because of the size of the individual Class Members' claims, no Class Member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses as Defendants continue to engage in bad faith, unlawful, unfair, and deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action, in this case, presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

218.   Plaintiff and the Class do not anticipate any difficulty in the management of this litigation.

## IX.   **COUNTS BASED ON FLORIDA COMMON LAW**

### COUNT 1: FRAUD BY CONCEALMENT OR OMISSION
### AGAINST ALL DEFENDANTS

219.     Plaintiff realleges and incorporates by reference paragraphs 1 through 218 as though fully set forth herein.

220.     Plaintiff brings this claim on behalf of himself and the Class under the common law of fraudulent concealment. Defendants are liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

221.     Defendants knew or should have known the braking system in the Class Vehicles was defective in design and that the Brake Defect can cause partial or complete brake failure.

222.     Defendants knew or should have known the Brake Defect is a dangerous safety defect that can cause severe injury or death to Plaintiff and Class Members.

223.     Defendants had exclusive and superior knowledge concerning the Brake Defect that a reasonable consumer would be unable to discover after a reasonable investigation. Defendants also knew that reasonable consumers expect vehicles to have a fully functional braking system and would rely on that fact in deciding whether to purchase or lease a new or used motor vehicle.

224.     Defendants made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations.

225.     Defendants have still not made complete and adequate disclosure and continue to conceal material information regarding the Brake Defect.

226.     Defendants' concealment and suppression of material facts, in whole or in part, is to maintain a luxury market for their vehicles or a profitable partnership, to protect their profits, and to avoid recalls that would damage the brands' reputation and have high costs.

227.     Through their omissions regarding the Brake Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to

either purchase a Class vehicle that they otherwise would not have purchased or pay more for a Class Vehicle than they otherwise would have paid.

228.    Defendants are liable to Plaintiff and the Class for damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

229.    Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT 2: NEGLIGENT MISREPRESENTATION
## AGAINST FERRARI NA AND FERRARI SPA

230.    Plaintiff realleges and incorporates by reference paragraphs 1 through 218 as though fully set forth herein.

231.    Plaintiff asserts this Negligent Misrepresentation Count on behalf of himself and the Class under the common law of negligent misrepresentation.

232.    Ferrari NA and Ferrari SpA knew or should have known the braking system in the Class Vehicles was defective in design and that the Brake Defect can cause partial or complete brake failure.

233.    Ferrari NA and Ferrari SpA knew or should have known the Brake Defect is a dangerous safety defect that can cause severe injury or death to Plaintiff and Class Members.

234.    Ferrari NA and Ferrari SpA had exclusive and superior knowledge concerning the Brake Defect that a reasonable consumer would be unable to discover after a reasonable investigation. Ferrari NA and Ferrari SpA also knew that reasonable consumers expect vehicles to have a fully functional braking system and would rely on that fact in deciding whether to purchase or lease a new or used motor vehicle.

235.   Ferrari NA and Ferrari SpA made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations.

236.   Ferrari NA and Ferrari SpA negligently misrepresented, in owners' manuals, maintenance schedules, online, to their representatives and elsewhere, the standard, quality, or grade of the Class Vehicles and the fact that the braking system installed in the Class Vehicles is defective.

237.   Ferrari NA and Ferrari SpA misrepresented that they would remedy any defects but unconscionably temporarily limited coverage of their express warranties despite knowledge of the recreational use of the Class Vehicles that may lead to the Defect lying latent for extended periods.

238.   Plaintiff and Class members justifiably relied upon Ferrari NA's and Ferrari SpA's negligent misrepresentations of material facts.

239.   Plaintiff and Class members would not have purchased the Class Vehicles but for Ferrari NA's and Ferrari SpA's negligent misrepresentations of material facts regarding the nature and quality of the Class Vehicles and the existence of the Brake Defect and corresponding safety risk.

240.   As a direct result of Ferrari NA's and Ferrari SpA's negligent conduct, Plaintiff and Class members have suffered actual damages and ascertainable loss to be determined at trial.

## COUNT 3: UNJUST ENRICHMENT
## AGAINST ALL DEFENDANTS[76]

241.   Plaintiff realleges and incorporates by reference paragraphs 1 through 218 as though fully set forth herein.

---

[76] Plaintiff brings this count against Bosch GmbH, and Bosch LLC as the agent/alter ego of Bosch GmbH, based on its omissions and concealment of material facts only.

242.     Plaintiff asserts this Unjust Enrichment Count on behalf of himself and the Class under the common law of unjust enrichment.

243.     Plaintiff and Class Members directly or indirectly conferred a benefit on Defendants by overpaying for Class Vehicles at prices that were artificially inflated by Defendants' concealment of the Brake Defect and misrepresentations regarding the Class Vehicles' safety.

244.     As a result of Defendants' fraud and deception, Plaintiff and Class members were not aware of the facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

245.     Defendants knowingly benefitted from their unjust conduct. They sold and leased Class Vehicles equipped with a Brake Defect for more than what the vehicles were worth, at the expense of Plaintiff and Class members.

246.     Defendants readily accepted and retained these benefits from Plaintiff and Class Members.

247.     It is inequitable and unconscionable for Defendants to retain these benefits because they misrepresented that the Class Vehicles were safe and intentionally concealed, suppressed, and failed to disclose the Brake Defect to consumers.

248.     Plaintiff and Members of the Class would not have purchased the Class Vehicles had they been informed of the Brake Defect.

249.     Plaintiff and Class Members do not have an adequate remedy at law.

250.     Equity cannot in good conscience permit the Defendants to retain the benefits that they derived from Plaintiff and Class Members through unjust and unlawful acts, and therefore, restitution or disgorgement of the amount of the Defendants' unjust enrichment is necessary.

## X.   COUNTS BASED ON FLORIDA STATUTORY LAW

### COUNT 4: BREACH OF EXPRESS WARRANTY
### FLA. STAT. §§ 672.313 AND 680.21
### AGAINST FERRARI NA AND FERRARI SPA

251.   Plaintiff realleges and incorporates by reference paragraphs 1 through 218 as though fully set forth herein.

252.   Plaintiff brings this count under Florida law, individually and on behalf of the members of the Florida Class, against Ferrari NA and Ferrari SpA.

253.   The Class Vehicles are "goods" under Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

254.   Ferrari NA and Ferrari SpA are "merchants," "sellers," and "lessors," of the Class Vehicles under Cal. Com. Code §§ 672.104(1) and 680.1031(3)(k), § 672.103(1)(d), and § 680.1031(1)(p), respectively.

255.   Plaintiff and Class Members who purchased and leased the Class Vehicles in Florida are "buyers" and "lessees" under Fla. Stat. §§ 672.103(1)(a) and 680.1031(1)(n).

256.   Ferrari NA and Ferrari SpA issued an express written warranty for each Class Vehicle they sold or leased that warranted the Class Vehicles would be free of defects in materials and workmanship at the time of sale or lease and that the Class Vehicles contained properly functioning braking systems.

257.   Ferrari NA and Ferrari SpA knowingly breached their warranty for the Class Vehicles because the Class Vehicles contain the Brake Defect, subjecting Plaintiff and Class Members to the risk of loss and injury.

258.   Ferrari NA and Ferrari SpA concealed and misrepresented the Brake Defect and knew the Class Vehicles were inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Class Members.

259.     Plaintiff and Class Members were exposed to Ferrari NA's and Ferrari SpA's misrepresentations, and they had no way of discerning that Ferrari NA's and Ferrari SpA's representations were false and misleading or otherwise learning the material facts that Ferrari NA and Ferrari SpA had concealed or failed to disclose.

260.     Plaintiff and Class Members reasonably relied on Ferrari NA's and Ferrari SpA's express warranties when purchasing or leasing their Class Vehicles.

261.     Plaintiff and Class Members timely provided Ferrari NA and Ferrari SpA notice of the issues raised in this count and this Complaint and an opportunity to cure on July 12, 2023. *See* Exs. B, C.

262.     Alternatively, Plaintiff and Class Members were excused from providing Ferrari NA and Ferrari SpA with notice and an opportunity to cure the breach because it would have been futile. As alleged above, Ferrari NA and Ferrari SpA knew about the Brake Defect for years; however, to date, Ferrari NA and Ferrari SpA have not instituted an adequate repair program with respect to the Defective Master Cylinder / Brake Booster Assembly or even fully disclosed that the Brake Defect exists in all Class Vehicles.

263.     As a direct and proximate result of Ferrari NA's and Ferrari SpA's breach of their express warranties, the Class Vehicles were and continue to be defective, and the Brake Defect was not remedied. Therefore, Plaintiff and Class Members have been damaged, in an amount to be proven at trial, through their overpayment at the time of purchase or lease for the Class Vehicles with an undisclosed safety defect that would not be remedied.

**COUNT 5: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**FLA. STAT. §§ 672.314 AND 680.212**
**AGAINST FERRARI NA AND FERRARI SPA**

264.     Plaintiff realleges and incorporates by reference paragraphs 1 through 218 as though fully set forth herein.

265.     Plaintiff brings this count under Florida law, individually and on behalf of the members of the Florida Class, against Ferrari NA and Ferrari SpA for his Class Vehicle.

266.     The Class Vehicles are "goods" under Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

267.     Ferrari NA and Ferrari SpA are "merchants," "sellers," and "lessors," of the Class Vehicles under Com. Code §§ 672.104(1) and 680.1031(3)(k), § 672.103(1)(d), and § 680.1031(1)(p), respectively.

268.     Plaintiff and Class Members who purchased and leased the Class Vehicles in Florida are "buyers" and "lessees" under Fla. Stat. §§ 672.103(1)(a) and 680.1031(1)(n).

269.     Florida law conferred an implied warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which they were to be used pursuant to Fla. Stat. §§ 672.314 and 680.212.

270.     Plaintiff and Class Members purchased or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them. At all relevant times, Ferrari NA and/or Ferrari SpA was the merchant, manufacturer, warrantor, and/or seller of the Class Vehicles.

271.     Ferrari NA and Ferrari SpA made affirmations of fact, including that its Class Vehicles were durable, reliable, and dependable and that the braking system would operate correctly. These affirmations created an implied warranty that the Class Vehicles conformed to Ferrari's affirmations of fact. The Class Vehicles, however, are not durable, reliable, or dependable; instead, the Brake Defect, in reality, causes the vehicles to lose braking capability during regular operation suddenly.

272.     The Class Vehicles are not merchantable, and as such, Ferrari NA and Ferrari SpA breached their implied warranties because at the time of sale and all times thereafter:

(a)     The Class Vehicles would not pass without objection in the automotive trade given the Brake Defect;

(b)     The Brake Defect renders the Class Vehicles unsafe to drive and unfit for ordinary purposes;

(c)     The Class Vehicles and the brake systems therein were inadequately labeled as safe and reliable, and the labeling failed to disclose the Brake Defect; and

(d)     The Class Vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

273.     Plaintiff and Class Members timely provided Ferrari NA and Ferrari SpA notice of the issues raised in this count and this Complaint and an opportunity to cure on July 12, 2023. *See* Exs. B, C.

274.     Alternatively, Plaintiff and Class Members were excused from providing Ferrari NA and Ferrari SpA with notice and an opportunity to cure the breach because it would have been futile. As alleged above, Ferrari NA and Ferrari SpA have long known that the Class Vehicles contained the Brake Defect and that the Brake Defect has caused brake systems to malfunction in crashes involving the Class Vehicles; however, to date, Ferrari NA and Ferrari SpA have not instituted an adequate recall or any other repair program with respect to the Defective Master Cylinder / Brake Booster Assembly or even acknowledged that the Brake Defect exists in all of those Class Vehicles.

275.     Plaintiff, individually and on behalf of Class Members, seeks all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

### COUNT 6: VIOLATIONS OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT
### FLA. STAT. § 501.201, *et seq.*
### AGAINST ALL DEFENDANTS[77]

276.     Plaintiff realleges and incorporates by reference paragraphs 1 through 218 as though fully set forth herein.

277.     Plaintiff brings this count under Florida law, individually and on behalf of the members of the Class.

278.     Plaintiff and Class Members are "consumers" under Fla. Stat. § 501.203(7) because they purchased the Class Vehicles primarily for personal, family, or household use.

279.     Defendants were and are engaged in "trade or commerce" under the meaning of Fla. Stat. § 501.203(8).

280.     The Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

281.     By the conduct described in detail above and incorporated herein, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. § 501.204(1).

282.     Defendants' violations of the Florida UDTPA occurred repeatedly in their trade or practice—including the design, manufacture, distribution, marketing, sale, and lease of the Defective Master Cylinder / Brake Booster Assembly and the Class Vehicles.

---

[77] Plaintiff brings this count against Bosch GmbH, and Bosch LLC as the agent/alter ego of Bosch GmbH, based on its omissions and concealment of material facts only.

283.    Defendants, through their agents, employees, and/or subsidiaries, violated the Florida UDTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles and the Brake Defect, as detailed above.

284.    Defendants had an ongoing duty to Plaintiff and Class Members to refrain from unfair or deceptive practices under the Florida UDTPA in the course of their business.

285.    Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and/or suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had properly functioning and reliable brake systems. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did, in fact, deceive reasonable consumers, including Plaintiff and Class Members, about the true safety and reliability of the Class Vehicles and/or the Defective Master Cylinder / Brake Booster Assembly installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

286.    Defendants intended for Plaintiff and Class Members to rely on their misrepresentations, omissions, and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid, believing that their vehicles would not have a Brake Defect that would affect the quality, reliability, and safety of the Class Vehicles.

287.    Plaintiff's and Class Members' reliance was reasonable, as they had no way of discerning that Defendants' representations were false and misleading or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel Defendants' deception on their own.

288.     Had they known the truth about the Brake Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, or they would have paid significantly less for them.

289.     As a direct and proximate result of Defendants' deceptive practices, Plaintiff and Class Members have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle was purchased or leased.

290.     Defendants' violations present a continuing risk to Plaintiff and Class Members, as well as to the general public because the Class Vehicles remain unsafe due to the Brake Defect therein. Defendants' unlawful acts and practices complained of herein affect the public interest.

291.     Pursuant to Fla. Stat. § 501.211, Plaintiff and Class Members seek an order enjoining the above unfair or deceptive acts or practices and awarding actual damages, treble damages, restitution, attorneys' fees, and any other just and proper relief available under the Florida UDTPA against the Defendants.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment against Defendants, granting the following relief:

a.     An order certifying this case as a class action and appointing Plaintiff's counsel to represent the Class and Plaintiff as a representative of the Class;

b.     All recoverable compensatory and other damages sustained by Plaintiff and the Class;

c.     Actual, treble, punitive, and/or statutory damages for injuries suffered by Plaintiff

and the Class in the maximum amount permitted by applicable law;

      d.      An order (1) requiring Defendants to cease their wrongful conduct as set forth above immediately; (2) enjoining Defendants from continuing to conceal material information about the Brake Defect of the Class Vehicles; and (3) requiring Defendants to refund to Plaintiff and all members of the Class the funds paid to Defendants for the Class Vehicles, and/or repairs resulting from the Brake Defect;

      e.      Payment of reasonable attorneys' fees and costs, as may be allowable under applicable law; and

      f.      Such other relief as the Court may deem just and proper.

## XII.    **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a trial by jury on all causes of action so triable.

Dated:  February 16, 2024

 

Michael J. Flannery (*pro hac vice forthcoming*)
**CUNEO GILBERT & LADUCA, LLP**
Two CityPlace Drive
St. Louis, MO 63141
P: 314-226-1015
mflannery@cuneolaw.com

Gary K. Burger (*pro hac vice forthcoming*)
**BURGER LAW, LLC**
500 North Broadway
Suite 1860
St. Louis, MO 63102
P: 314-542-2222
gary@burgerlaw.com

Charles J. LaDuca (*pro hac vice forthcoming*)
Alexandra C. Warren (*pro hac vice

Respectfully submitted:

*/s/ Zachary S. Bower*
Zachary S. Bower (SBN 17506)
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
2222 Ponce De Leon Blvd.
Miami, FL 33134
P: 973-994-1700
zbower@carellabyrne.com

James E. Cecchi (*pro hac vice forthcoming*)
Caroline F. Bartlett (*pro hac vice forthcoming*)
Jordan M. Steele (*pro hac vice forthcoming*)
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
P: 973-994-1700
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com
jsteele@carellabyrne.com

*forthcoming*)
**CUNEO GILBERT &
LADUCA, LLP**
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016
P: 202-789-3960
charles@cuneolaw.com
awarren@cuneolaw.com

W. Daniel "Dee" Miles, III (*pro hac vice
forthcoming*)
H. Clay Barnett, III (*pro hac vice
forthcoming*)
Mitchell Williams (*pro hac vice forthcoming*)
Dylan T. Martin (*pro hac vice forthcoming*)
**BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, P.C.**
218 Commerce St
Montgomery, AL 36104
P: 334-269-2343
dee.miles@beasleyallen.com
clay.barnett@beasleyallen.com
mitch.williams@beasleyallen.com
dylan.martin@beasleyallen.com

*Attorneys for Plaintiff and
the putative Class*